UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert B. BLAND, Inocente Ruben-Morell, Florencio Agustin-Mayor, Augustin Viviano Castro, Alberto Mark and Lorenzo Aros, Defendants-Appellants.

No. 80–3090.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 17, 1981.

John M. Lawrence, New Orleans, La., for Bland.

Michael J. Osman, Robert M. Duboff, Miami, Fla., for all other defendants-appellants.

John P. Volz, U.S. Atty., Michael Schatzow, Ronald A. Fonseca, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before COLEMAN, GARZA and SAM D. JOHNSON, Circuit Judges.

COLEMAN, Circuit Judge.

Robert B. Bland, Inocente Ruben-Morell, Florencio Agustin-Mayor, Augustin Viviano Castro, Alberto Mark, and Lorenzo Aros were all convicted of conspiracy to possess with the intent to distribute 18.1 tons of marijuana in violation of 21 U.S.C., Section 841(a)(1) and 846 (1976). Each defendant received a sentence of five years imprisonment plus a special parole term of fifteen years.

On appeal, all defendants argue that the District Court erred (1) in denying their motions to suppress various pieces of evidence; (2) in denying their motions for judgments of acquittal because of insufficient evidence that they knowingly and intentionally participated in the conspiracy to possess and distribute; and (3) in adding a special parole term upon the sentence of each defendant. Bland also raises the refusal of the trial court to give certain requested jury instructions.

We affirm the convictions of Bland and Mayor, but for the insufficiency of the evidence we reverse the convictions of the other defendants. The government concedes, and we agree, that a special parole term for conspiracy is unauthorized. The District Court will strike the special parole term from the sentences imposed on Bland and Mayor.

I

*The Facts*

In February, 1979, Leo Richardson, a New Orleans marine broker, was retained by Alberto Martin (of Overseas Marine Sales Limited, Inc., (OMSL), a Florida company, to assist in finding a tugboat and a barge of specific dimensions. Richardson

found acceptable vessels and they were purchased. The name of the tug was the "Dixie Rover", later changed to the "Nautilus". Richardson assisted OMSL several other times that year. According to Richardson, he was not expecting any OMSL employee or representative to call him or come to see him in September, 1979, but he also said that it would not be unusual for clients to contact him unexpectedly for assistance, including assistance in repairing vessels. Richardson had not seen any of the defendants before the trial.

On July 12, 1979, defendant Robert Bland and one Bill Good signed a contract to purchase a house and a boathouse from Tatiana Farmer and her husband on Bayou Lacombe. The real purchase price was $255,000, named in the purchase agreement as $185,000. Mrs. Farmer received the extra $70,000 in cash on the day the agreement was signed. The actual transfer of the title was not to take place until October 15, but Mrs. Farmer was to vacate the premises by July 25. On the day she moved out Mrs. Farmer observed an 18–wheel tractor trailer rig parked near the workshop on the property with the words "Institutional Foods Gretna" lettered on the side. According to records of the Louisiana Secretary of State, Robert Bland was one of the incorporators of Southern Institutional Food Sales and Service, Inc.

Two or three days later, Mrs. Farmer was back on the property and observed that the trailer had been moved to a position near some magnolia trees which had been trimmed to a height of about 18 feet above the ground. A work crew of Latin-appearing males, with whom she conversed primarily in Spanish, was painting the house a bright yellow, painting the pool, and otherwise renovating the house. During the painting process, the roof was oversprayed, that is, the yellow paint extended about two feet up onto the roof shingles. Except for Bland, Mrs. Farmer had never seen any of the defendants before trial.

Sometime in August, 1979, Bland mentioned to a business acquaintance, Pedro Reynosa, that he needed someone to work on his boat. Earlier, a relative of Reynosa's, Mrs. Lorenzo Aros, had said that her husband needed a job. Reynosa passed Bland's telephone number along to Aros, and Aros contacted Bland. Aros then called Reynosa to tell him that if he was hired by Bland, he would visit Reynosa in New Orleans. The government introduced into evidence a registration card from the Fountain Bay Club Hotel in New Orleans signed by a Lorenzo Aros *who listed his address as Miami.* The arrival date was September 6, although no year was given, and the room assigned to him was number 659.

In late August, United States customs agents received information that a yacht, or yachts, including the "Summer Madness", would rendezvous with a "mother ship" in the Gulf of Mexico, off-load 55 tons of marijuana, and bring it back to a Bayou Lacombe, Louisiana shipyard. On September 2, 1979, customs agents began surveillance of the "Summer Madness" which was docked about 75 yards from Schubert's Marine Service on a canal leading to Lake Pontchartrain. On the morning of Saturday, September 8, the boat was brought to Schubert's, where it took on approximately 450 gallons of diesel fuel, 12 quarts of motor oil, 2 quarts of transmission fluid, and four bags of ice. Schubert's manager testified that the yacht had trouble docking; Bland told him that he was having clutch trouble, and the dock boy added some motor oil.

The mechanic who normally worked on the "Summer Madness" and who had been qualified as an expert on marine clutch assemblies, testified that, when checked in early August, the "Summer Madness" clutch assembly was leaking oil and, as a result, was dragging and refusing to go into gear; if enough oil was added, the engine would go back into gear. The mechanic told Bland that the clutch would last out the season if the oil level was carefully monitored.

According to Gary Lewis Baker, a friend of Bland's, who was purchasing agent for a hotel which bought 50–60% of its produce

from Bland's company, Bland had invited him to go fishing that weekend. He arrived at Bland's boat Saturday and went with Bland to have it fueled at Schubert's. He testified that Bland had trouble with the clutch that day because the oil level was low; once oil was added, the clutch began functioning again. However, Baker did not go on the trip as planned and left the boat after an hour and half; he testified that he really couldn't remember why he didn't go but thought that it was because of a date with his girlfriend on Saturday night. He did not see Aros on the boat that morning, but another man, Mike Grendella, was on the boat.

That afternoon, the "Summer Madness" moved out toward the Gulf of Mexico. At this point, Bland began his voyage to federal prison. The vessel proceeded down the New Basin Canal, into Lake Pontchartrain, the Harbor Navigational Canal, and then into the Mississippi River Gulf Outlet (Gulf Outlet). The "Summer Madness" was being watched by customs agents, using both planes and boats. One customs pilot testified that the "Summer Madness" appeared to be traveling 20–22 knots in a southeasterly direction down the Gulf Outlet and then entered the Breton Sound area of the Gulf of Mexico. It met a tugboat and a barge (a barge-tow) heading in. The yacht swerved to the left in a 15 degree turn and approached the barge-tow. It then continued outbound into the Gulf. Around 7 P.M. that evening, the "Summer Madness", now at a point approximately 52 nautical miles due south of Gulfport, Mississippi, came upon the tug "Nautilus", which was on a heading 180 degrees away from New Orleans. The vessels came within 100 feet of each other. The "Summer Madness" then turned and began heading back toward New Orleans. The "Nautilus" changed course and likewise began heading northwesterly toward New Orleans, behind the "Summer Madness". No radio communications between the two vessels were intercepted, nor was any other activity or communication between the two vessels observed.

The vessels proceeded in the same formation back across the Gulf and into the Gulf Outlet. When darkness fell, the vessels displayed all proper running lights. They continued on up the Outlet until they reached the head of the Industrial Canal. The speed of the vessels varied from 5–10 knots; the distance between them varied from ¼ to ½ mile. There was moderate traffic on the Canal.

Between 4 and 4:30 A.M. Sunday morning, both the "Summer Madness" and the "Nautilus" went dead in the water, with the yacht ahead of the tug. The tug was trying to switch from pulling its barge to pushing it before entering the narrow Industrial Canal. This was a difficult but not unusual procedure because it gives the tug more control of the barge in narrow passages. While dead in the water, the vessels were being watched by nine customs patrol officers in two custom boats. These officers decided to board and search both vessels at about 4:50 A.M. At all times prior to the boarding, no radio communication between the vessels had been intercepted nor was any other contact or activity observed on the vessels.

When the officers requested permission to board the "Summer Madness", Bland complied. Immediately prior to boarding, Bland and Aros were observed on the boat's flying deck, a position used for navigation and steering. Bland and Aros adequately identified themselves and produced the required documentation for the vessel. At trial, defense attorneys argued from the testimony concerning the yacht's clutch problems that the "Summer Madness" had simply stopped to add more oil.

At the same time, another group of customs patrol officers boarded the "Nautilus" barge. As they walked across it, none of them noticed any odor of marijuana. Officer Cobb, along with defendants Morell and Mark, continued onto the tug to speak with Captain Mayor in the wheelhouse. With a limited knowledge of Spanish, Cobb attempted to speak with Mayor, who had almost no knowledge of English. When Cobb asked for documentation for the ves-

sel, Mayor took him into a cabin aft of the wheelhouse where Mayor produced an FCC radio license for the tug "Nautilus". Cobb then told him that he wanted to see the registration papers for the vessel, not its radio license. Mayor began rifling through stacks of charts, maps, and vessel records in the cabin, but never produced accurate documentation for the vessel. Cobb admitted that possibly Mayor did not comprehend what he was saying. Mayor became somewhat nervous when he could not find papers which would satisfy the officer's request. While looking for the papers, Mayor told Cobb that he and his crew had left Miami, Florida, five days earlier and were on the way to Tibo Shipyards in Louisiana. Mayor did not know the exact location of the shipyards and had been instructed that upon reaching the New Orleans area he should call Leo Richardson who, as above stated, had arranged the acquisition of the "Nautilus".

Meanwhile, other customs officers on the "Nautilus" had radioed the officers on the "Summer Madness" that no contraband had been found on the tug, and the yacht was allowed to proceed. The officer who had boarded the "Summer Madness" then went to the "Nautilus". Still no odor of marijuana was detected. One of the officers, Officer Fuller, noticed several pieces of plywood and two-by-fours in the center of the barge; he moved these materials aside and saw four plates which had been cut out of the barge and then puttied back. Grey paint had been applied to the putty. Lying nearby was a can of grey paint, with paint spilling down the sides, which apparently matched that used on the putty. The putty and paint were soft. Fuller said it appeared freshly painted, although he admitted he had no knowledge of drying time for

paint nor in determining length of time since paint had been applied. While another officer went to get tools to scrape the putty away, Fuller went to the forward part of the barge where there were four circular hatch covers. He lifted the first and saw diesel fuel. Lifting the second cover revealed the marijuana. Fuller said that the hatch covers where not locked and that it took him 15–20 seconds to open them. The marijuana bales would not fit through these hatch covers so they apparently had been loaded through the cut out, puttied sections.

The captain and the crew were then arrested; the barge and tug were seized. Fuller then reboarded his boat and overtook the "Summer Madness" which was traveling very slowly up the Canal. Aros and Bland were then arrested, and the "Summer Madness" was seized.

All defendants were searched immediately upon arrest. What appeared to be a radio code in Spanish was found in Mayor's pocket.[1] Approximately $1,200 was found on defendant Mark; $900 on defendant Castro, and the other crew members had $3 and $25 on them. Castro's and Mark's money was wrapped in a $1,000 bank wrapper. Numerous charts, navigation maps, and other documents were seized from the cabin and wheelhouse areas of the tug when it was thoroughly searched later. One of the charts, used by the government at trial, had pencil lines apparently delineating a course from Fort Myers, Florida, to the Number 1 sea buoy off the Gulf Outlet, where the two vessels first came into contact with each other. On its opposite side the chart had another course charted and numerous other charts and maps were recovered from the tug, some with writing and lines drawn on them. There was no direct evidence that

1. The code, translated into English, reads as follows:

98–No contact.
97–Meet with the customs.
96–Cargo aboard. On our way.
95–One day.
94–Suspended mission.
93–Returning home.
92–Difficulty with tugboat.
91–We meet diesel.

90–Enemy ship on sight.
89–We're being boarded.
88–We have malfunctioning.
87–We cannot take care of the malfunctioning.
86–We can solve the malfunctioning.
85–Arriving at port of meeting.
84–Need doctor.
83–Too choppy or too rough for loading.

the chart with the Fort Myers to Number 1 buoy was actually in use on the tug when it was stopped.

When Bland was searched, he had $10,000 cash, a piece of paper bearing the name of Lorenzo Aros, a telephone number, and a flight number. Bland explained that the money was business cash receipts which had been turned into him that morning. An Exxon road map of Louisiana was found on the "Summer Madness". A dotted line had been drawn down the Gulf Outlet to the Breton Sound area, the general area where the two vessels had encountered each other. In addition, a slip of paper with the coordinates 29° 26′N 88° 43′W, a point about 5–12 miles from where the vessels met, was found on the yacht. Following the arrest of Bland and Aros, Officer Fuller drove the "Summer Madness" to a marina four miles away. He testified that although he used the clutch extensively he had no problems with it.

When removed from the barge hold, the marijuana bales were damp and had a musty odor, but they did not appear to have had water coming down on them or to have been resting in water. The defense presented testimony from Hector Pazo who was qualified as an expert in naval engineering and who had inspected the barge before appearing in court. Pazo testified that since the bales had not been standing in water and were only damp, not wet, and since no odor of marijuana was detected by anyone on the barge and the tug until the hatch cover was lifted, the hatches had been sealed tightly during the sea voyage. With the hatches so sealed, it would be impossible for crew members aboard the tug to know from its presence in the hold that the barge contained cargo, or the nature of the cargo, unless they opened the hatches. If the hatches had been sealed in a humid area of the world, then the cargo inside would become damp because of moisture condensation. Moreover, Pazo testified that an experienced tugboat captain would not be able to tell by the way the tug and barge navigated in the water, or by looking at it, or walking on it, that a barge of this size was laden with eighteen tons.

The government, in its post arrest investigation, took fingerprints from all defendants. However, no attempt was made to lift fingerprints from either of the vessels or from any of the physical evidence in the case. The hands and clothing of the defendants were not tested for paint or marijuana residue. The paint on the cut out sections of the barge was not analyzed to see if it matched the paint in the can found on the barge.

Bernd Ulken, owner of the property adjacent to Mrs. Farmer's, testified that on one Saturday in September around 4 P.M. he saw two people moving a semi-trailer onto the Farmer property. The next Monday morning around 7 or 8 A.M., he saw a tractor cab of the kind which pulls a semi-trailer parked outside the gate and two people trying to open the gate. About an hour later, he saw that the gate had been broken and the semi-trailer moved. Ulken had never seen these individuals working on the property before; neither one was defendant Aros. Mrs. Farmer passed the property on September 10, and also noticed that the gate was broken and that the semi-trailer had been moved.

The sale of the Farmer property, scheduled to become final on October 15, never took place. Although requested to do so, Mrs. Farmer refused to extend the closing date. Mrs. Farmer received the cancellation of the purchase contract on October 16 or 17. By time of trial in December, neither Bland nor Good had asked for the return of the $70,000 downpayment. There was some testimony that Bland had assigned his interest in the property to Good around August 14, 1979. The witness, a cousin of Good's, who was trying to sell the property for him, later admitted that he was not told of this assignment until after Bland's arrest, and Bland's signature appears on the cancellation dated October 16.

## II

### Evidence Not Suppressed

We need not long be detained by the appellants' arguments concerning the denial

of the motions to suppress. Assuming, without specifically so deciding, that the defendants had standing to raise these motions, they are clearly without merit.

The agents had advance information as to the likely activities of the "Summer Madness". The corresponding maneuvers of that vessel, executed while under the surveillance of the agents, confirmed the likely accuracy of the information. The "Nautilus" was first seen at a position 52 miles due south of Gulfport, Mississippi, outside the territorial sea. It was seen to cross the international boundary. That being so, the customs officials could search the vessel without so much as a modicum of suspicion, *see United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617, 626 (1977), and cases cited in *United States v. Whitmire*, 595 F.2d 1303, 1317 (5th Cir., 1979); *United States v. Richards*, 638 F.2d 765 (5th Cir., 1981); *United States v. Prince*, 491 F.2d 655 (5th Cir., 1974); *United States v. Sink*, 586 F.2d 1041 (5th Cir., 1978).

Once the marijuana was found on the barge, there was abundant probable cause to arrest Bland and Mayor on the "Summer Madness" and search them as an incident to the arrest.

There was no violation of Fourth Amendment rights in this case and these contentions are due to be dismissed out of hand.

### III

*The Sufficiency of the Evidence as to Bland and Mayor*

At the conclusion of the government's case, all defendants moved for a judgment of acquittal based upon insufficient evidence. These motions were denied. The defendants then presented evidence in their behalf. After all evidence was presented, the motions were renewed and again denied. In reviewing a case in such a posture, the appellate court is free to consider all evidence introduced at trial including that introduced by the defendants, *United States v. Gordon*, 410 F.2d 1121, 1122 (5th Cir., 1969). Of course, by presenting evidence in their behalf, the defendants waived any error that might have existed in the trial court's denial of their motion for judgment of acquittal at the conclusion of the government's case in chief, *United States v. Jackson*, 444 F.2d 1389 (5th Cir., 1971).

The standard for reviewing the sufficiency of the evidence is whether "there is substantial evidence taking the view most favorable to the government to support it". *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Malatesta*, 590 F.2d 1379, 1382 (5th Cir., 1979) (en banc), *cert. denied*, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59. If, after reviewing the evidence, and inferences that may reasonably be drawn from it, in the light most favorable to the government, it appears that a reasonable-minded jury must necessarily have entertained a reasonable doubt as to the appellant's guilt or, alternatively, any essential element of the crime, the convictions must be reversed. *United States v. Forrest*, 620 F.2d 446, 450 (5th Cir., 1980); *United States v. Odum*, 625 F.2d 626, 628 (5th Cir., 1980); *United States v. Barrera*, 547 F.2d 1250, 1255 (5th Cir., 1977). Alternatively, the test is whether the evidence, viewed in the proper manner, is such that the trier of fact could reasonably infer that the defendant was guilty beyond a reasonable doubt. *United States v. Fox*, 613 F.2d 99, 101 (5th Cir., 1980). The test for reviewing sufficiency of the evidence questions has also been stated as whether, viewing the evidence in the light most favorable to the government and making all credibility choices and inferences in support of the verdict, reasonable minds could have found the evidence inconsistent with every reasonable hypothesis of innocence. *United States v. Burgin*, 621 F.2d 1352, 1357 (5th Cir., 1980). *United States v. Haggins* explained the test as follows:

[I]f the trial or appellate court is satisfied that the jury could not reasonably conclude that the evidence fails to ex-

clude every reasonable hypothesis but that of guilt then the trial court, or on appeal, this Court must hold that "the jury must necessarily have had a reasonable doubt as to the inconsistency".

545 F.2d 1009, 1012 (5th Cir., 1977), quoting *United States v. Nazien*, 504 F.2d 394, 395 (5th Cir., 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975). Since circumstantial evidence is to be treated no differently than direct evidence, *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954), the test for judging the sufficiency of the evidence is the same whether the evidence is direct or circumstantial. *United States v. Gonzalez*, 617 F.2d 104, 106 (5th Cir., 1980); *United States v. Fox, supra.*

■■ For a defendant to be convicted of conspiracy under 21 U.S.C., Section 846, there must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew of it, and with that knowledge, voluntarily became a part of it. *United States v. Navar*, 611 F.2d 1156, 1159 (5th Cir., 1980); *United States v. Harbin*, 601 F.2d 773, 781 (5th Cir., 1979). Moreover, conspiracy to commit a particular substantive offense cannot exist without at least that degree of criminal intent necessary for the substantive offense itself. *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959); *United States v. Malatesta, supra.*

■ The element contested here is that of knowing and intentional participation in the conspiracy. It can hardly be questioned that a conspiracy was afoot here, and certainly defendants' actions, especially those on the tug, aided the conspiracy along in its progress. Yet, the question remains whether the government proved beyond a reasonable doubt that all defendants knew of this conspiracy and, with that knowledge, participated in it.

As to Bland and Captain Mayor, we are left with no doubt whatever that the evidence, as recited in the first portion of this opinion, is sufficient to support the jury's verdict. When Bland's actions are viewed in light of his acquisition of the Farmer property, the activities that took place on that property, and the documentary evidence found on the yacht, it becomes clear that there can be no reasonable hypothesis by which it could be believed that Bland's trip to Breton Sound, his meeting the "Nautilus", and preceding it into New Orleans was merely coincidental, with no knowledge of or agreement to bring in the marijuana.

The jury could also properly infer that Captain Mayor was aware of the nature of the cargo which he had in charge, *United States v. Sanchez*, 634 F.2d 938, 942 (5th Cir., 1981); *United States v. Willis*, 639 F.2d 1335 (5th Cir., 1981). This inference, along with the radio code found in his pocket, certainly provides substantial evidence which would allow the jury reasonably to infer that Mayor acted with the requisite knowledge and intent.

IV

*The Sufficiency of the Evidence as to Aros and the Crew Members on the "Nautilus"*

■ On this point all that the government has shown is that Mark, Morell, and Castro were crew members on a tug towing a barge loaded with marijuana and that Aros worked for a man involved in a conspiracy to import marijuana, being present while his employer acted in furtherance of this scheme. The government is forced to rely on presence preceding and at the time of the arrest, which has never been sufficient to sustain a conspiracy conviction in this Circuit, *United States v. Willis, supra; United States v. Reyes*, 595 F.2d 275, 280, 281 (5th Cir., 1979); *United States v. Littrell*, 574 F.2d 828, 833, 834 (5th Cir., 1978).

Certain evidence, if pursued by the government, might have provided the necessary proof:

(1) Whether any fingerprints from these defendants were on the hatch covers, the cut out sections, the paint can, or in the cargo hold;

(2) Whether there was any residue of paint or putty on their bodies or clothing; and

(3) Whether there was any residue of marijuana in the same locations.

What it all comes down to is that the government failed to introduce any evidence that the crew members knew that the barge being towed by the "Nautilus" was carrying marijuana, *see United States v. Willis, supra.* And it introduced no evidence from which a jury could infer beyond a reasonable doubt that Aros knew he was doing anything more than assisting his employer in taking a vessel out into the Gulf.

### V

### *Other Issues*

As conceded by the government, the imposition of the special parole term upon Bland and Mayor is not authorized and must be reversed, *Bifulco v. United States*, 447 U.S. 381, 400, 100 S.Ct. 2247, 2259, 65 L.Ed.2d 205 (1980). On remand, the District Court is directed to strike the special parole term from these sentences.

Bland's argument that the District Court committed reversible error in refusing to instruct the jury as he requested is without merit. The instructions requested were adequately covered in the instructions given to the jury. *United States v. Alonzo*, 571 F.2d 1384, 1388 (5th Cir., 1978).

The judgments against Bland and Mayor are AFFIRMED and REMANDED with instructions to the District Court to strike the special parole term.

The judgments against Aros, Mark, Morell, and Castro are REVERSED and the case is REMANDED to the District Court for entry of a judgment of acquittal for these four defendants.