UNITED STATES of America, Appellee,

v.

Jorge LOPEZ, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alexis RAMOS, Defendant, Appellant.

Nos. 82–1184, 82–1185.

United States Court of Appeals,
First Circuit.

Argued April 5, 1983.

Decided June 10, 1983.

Certiorari Denied Oct. 3, 1983.
See 104 S.Ct. 187.

Francis K. Morris, Boston, Mass., by appointment of the Court, with whom Bowker, Elmes, Perkins, Mecsas & Gerrard, Boston, Mass., was on brief, for Jorge Lopez.

Mark M. Freeman, Boston, Mass., by appointment of the Court, with whom Linda Morton, Boston, Mass., was on brief, for Alexis Ramos.

William F. Weld, U.S. Atty., Boston, Mass., with whom John C. Doherty, Asst. U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, HAYNSWORTH,* Senior Circuit Judge, and BREYER, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

Alexis Ramos and Jorge Lopez were found guilty by a jury of three counts of possessing and importing marijuana with intent to distribute and three related conspiracy counts.[1] Ramos and Lopez were among eight crewmembers on board the vessel TIGER ROSE when 14 tons of marijuana were discovered in its hold by Coast Guard boarding personnel. They appeal from their convictions, contending among other things, that the evidence was insufficient to establish that they knowingly joined the conspiracy. We affirm.

---

* Of the Fourth Circuit, sitting by designation.

1. Specifically, the six-count indictment charged each defendant with (1) possession of marijuana in excess of 1,000 pounds with intent to distribute, 21 U.S.C. §§ 841(a), 841(b)(6), 846; (2) possession of marijuana on a United States vessel with intent to distribute, 21 U.S.C. §§ 955, 963; (3) importation of marijuana, 21 U.S.C. §§ 952, 960, 963; and (4) conspiracy to commit each of the three substantive offenses.

On October 27, 1981, Coast Guard personnel received a call from a lobster vessel indicating that TIGER ROSE had made little progress during the day and was possibly in distress. A seven-man crew under the command of Petty Officer Gapetz was dispatched from the Coast Guard's Scituate, Massachusetts station to investigate. Coast Guardsmen sighted the vessel, which was 72 feet in length and variously described as a fishing vessel and a small cargo craft, three and a half miles off the coast of Duxbury, Massachusetts, heading south toward the Cape Cod Canal. As the Coast Guard approached TIGER ROSE, Gapetz observed other vessels in close proximity. He and Boatswain Casey then boarded to perform a documents and safety inspection. Gapetz requested TIGER ROSE's captain, Emmanuel Hernandez, to assemble his crew at the bow, while the boarding party went to the berthing quarters at the vessel's rear to check the number of flotation devices on board. Finding an inadequate number, they also observed only five or six bunks in the sleeping compartment. Gapetz then went to the engine room to check the vessel's documentation numbers. He could not locate them, but did observe two additional sleeping pallets. Returning to the bow to inspect the main hold for the documentation numbers, Gapetz encountered a rubber life boat, a large piece of heavy canvas and a piece of plastic covering the hatches. Removing these coverings, he opened the hold and observed a large number of bales of what later proved to be marijuana. Both members of the boarding party testified they did not smell marijuana until after the hold was opened.

A later search of the vessel turned up crew manifests, navigational charts, a ship's log of sorts, and other documents. These documents revealed the itinerary of the vessel prior to her seizure in Massachusetts waters. TIGER ROSE's voyage had begun in late September 1981, when she sailed from Miami, Florida, to Aruba. Six crewmembers were aboard during this leg of the voyage, including the defendant, Alexis Ra-

mos, a United States citizen and resident of Miami. Upon arrival in Aruba, two more crewmembers joined the vessel, Jorge Lopez and Carmelo Mena.[2] From Aruba the vessel sailed to Barranquilla, Colombia, arriving on October 2, 1981. On October 6, 1981, TIGER ROSE left Barranquilla and made no further recorded stops until she was seized.

## I.

■ Before considering the sufficiency of the evidence, we consider other assignments of error. Lopez argues that the district court erred in admitting into evidence certain airline ticket receipts that were found aboard the TIGER ROSE. These receipts indicated that Lopez and Mena had paid cash to fly together from Miami to Aruba in late June 1981, from Aruba to Cali, Colombia, on July 1, and back to Aruba on August 8. We find no error. The jury could infer that Lopez and Mena had deliberately retained the three receipts for some purpose—quite possibly, as the government argued, to obtain reimbursement at the conclusion of the voyage. The itinerary of these flights was consistent with that inference, which would of course belie Lopez's claim to have been hired spontaneously on the docks of Aruba by a captain he had never previously known for a voyage to transport coffee. We find no abuse of discretion in allowing the jury to consider this evidence along with the other evidence in the case. See Fed.R.Evid. 403; *United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975).

■ Appellants contend that the district court's biased interrogation of Lopez deprived them of a fair trial. When the government concluded its cross-examination of Lopez, the district court focused on the circumstances surrounding his hiring on the Aruba docks and engaged him in the following colloquy:

COURT: When Hernandez [the captain] came along did he tell you who he was?

2. Mena was convicted of all six counts of the indictment, but he has not appealed.

LOPEZ: No, no, he didn't tell me.

COURT: Did he ask you any questions about yourself?

LOPEZ: No.

COURT: Did you have any conversation with him?

LOPEZ: No.

COURT: Did he just say, "Do you want a job as a member of the crew of the Tiger Rose?"

LOPEZ: Yes.

COURT: With no conversation before that?

LOPEZ: No.

COURT: All right. Thank you. You are excused.

We find no error. The court was entitled to question witnesses and the questions it asked were not improper. Fed.R.Evid. 614(b). The defendants also contend the district court exhibited bias in favor of the government by cutting short defense counsel's arguments and by expressing impatience with their presentation. We have reviewed the incidents alluded to and find none of them of such a nature as to deprive defendants of a fair trial. *Compare Bursten v. United States*, 395 F.2d 976, 983–84 (5th Cir.1968), *appeal after remand*, 453 F.2d 605 (5th Cir.1971), *cert. denied*, 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972) (reversing conviction and remanding for new trial where trial court's repeated interjections were "definitely prejudicial").

■ Appellants argue that the district court improperly admitted into evidence the hearsay statements of certain crewmembers under Fed.R.Evid. 801(d)(2)(E) without first determining—as required in *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977) —that a conspiracy existed and the appellants were members. Petty Officer Gapetz testified that certain crewmembers brought personal belongings to the bow, as if antici-

pating arrest, and later haltingly raised their hands as the hold was opened as if to surrender. Boatswain Casey testified that in response to his question, "what are you fishing for?" crewmember DuPoux responded, "fishing for everything." [3] Because no objections were made to the introduction of these statements, the court was not obliged to make a *Petrozziello* finding. *United States v. Campa*, 679 F.2d 1006, 1011 (1st Cir.1982).

■ Lopez argues that in instructing the members of the jury that they could infer facts from circumstantial evidence, the district court presented an unbalanced summary of the evidence that was tantamount to instructing the jury that presence on the vessel proved the critical element of knowledge. The challenged instruction reads as follows:

So in a particular case you may find, although you are not required to find, that each of the defendants was on board the Tiger Rose when it left Barranquilla, Colombia. You may find that they stayed on board that vessel until it reached the territorial waters of Massachusetts. You may find that it carried 13 or 14 tons of marijuana in its hold. You may find it had no fishing gear or refrigeration equipment for storing fish and it did no fishing, even though its papers listed it as a fishing vessel. You may find that it had or had not any running lights when it was seen, that it had no other cargo besides marijuana and, if you find those things beyond a reasonable doubt, all of those findings may be used by you as circumstantial evidence that the defendants were knowingly, intentionally and wilfully involved in the activities of the Tiger Rose. Similarly, you can decline to so find on the basis of

3. Ramos argues alternatively that DuPoux's statement should have been excluded because it was elicited during a custodial interrogation initiated without *Miranda* warnings. The only authority he cites for the unlikely proposition that safety inspections constitute custody for *Miranda* purposes, *United States v. Warren*, 550 F.2d 219 (5th Cir.1977), was overturned in

a later rehearing en banc. 578 F.2d 1058, 1070–72 (5th Cir.1978). Assuming *arguendo* that DuPoux's *Miranda* rights were somehow violated, Ramos does not have standing to raise the issue. *See United States v. Penn*, 647 F.2d 876 (9th Cir.), *cert. denied*, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980); *United States v. Pruitt*, 464 F.2d 494 (9th Cir.1972).

circumstantial evidence. It is a decision for the jury to make.

Because neither defendant objected to the charge as required in Fed.R.Crim.P. 30, we review only for plain error. Viewing the challenged instruction not in isolation but in the context of the overall charge, *United States v. Thomann*, 609 F.2d 560 (1st Cir. 1979), we discern nothing objectionable about the charge. The jury was told it did not have to find the circumstantial evidence sufficient. And the court later charged that mere presence on the vessel or association with conspirators did not establish knowing participation. Any possible misimpression would have been dispelled by this later instruction.

Finally, we are satisfied that both defendants received effective assistance of counsel within the "reasonably competent assistance" standard articulated in *United States v. Bosch*, 584 F.2d 1113 (1st Cir. 1978).[4]

## II.

■ Ramos failed to make a motion under Fed.R.Crim.P. 29 and is thus barred from mounting an ordinary challenge to the sufficiency of the evidence. *See United States v. Kilcullen*, 546 F.2d 435, 551 (1st. Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). Lopez made such a motion at the close of the government's case but waived it by failing to renew after presenting a defense. *See United States v. Greenleaf*, 692 F.2d 182, 185 (1st Cir.1982). Defendants may, therefore, secure a reversal for insufficiency of the evidence only if they can demonstrate their convictions were clearly and grossly unjust. *Id.* We are unable to conclude that the evidence of appellants' knowing participation in the conspiracy was so slight as to render their convictions clearly and grossly unjust. Indeed, there was substantial evidence of participation.

■ Appellants argue that the government failed to prove that they knew at the time they signed on with the TIGER ROSE that the vessel contained marijuana. Both Ramos and Lopez testified that the captain told them the vessel was carrying coffee to Halifax, Nova Scotia. They now emphasize the absence of noticeable odor of marijuana before the hold was opened. Thus, they argue, the government's evidence did not establish more than "mere presence" aboard a vessel that was later found to contain marijuana.

Courts have seldom accepted such an argument where, as here, factors such as the close relationship of the crew, the length of the voyage and the large amount of marijuana on board support an inference of knowing participation by crewmembers. In *United States v. Smith*, 680 F.2d 255 (1st Cir.1982), the defendant argued that he was a mere bystander, unknowingly caught up in a smuggling enterprise over which he had no control. We rejected this argument, observing that

> [The jury] was entitled to conclude that no one unconnected with such an enterprise would be allowed to travel on the [vessel] for 2000 odd miles, in close proximity to the crew and cargo, thus receiving intimate knowledge of the participants in a serious crime ... [S]uch is not normally the conduct one would expect of conspirators engaged in conduct which by its nature is kept secret from outsiders.

*Smith*, 680 F.2d at 260. Other courts have frequently rejected crewmember challenges to the sufficiency of the evidence where the circumstances of the voyage raise a strong inference of knowing participation by the entire crew. *See United States v. Martinez*, 700 F.2d 1358 (11th Cir.1983) (13 crewmembers, 13 tons of marijuana); *United States v. Sockwell*, 699 F.2d 213 (5th Cir.1983) (5 crewmembers, 75 tons); *United States v. Munoz*, 692 F.2d 116 (11th Cir.1982), *amend-*

---

**4.** Ramos's argument that the government's closing argument lacked an evidentiary basis must fail in view of Gapetz's testimony that he found two sleeping pallets in the engine room. This fact, together with the testimony describing the engine room as an unpleasant place to sleep, amply supports an inference of cramped, overcrowded conditions aboard the vessel.

*ing,* 681 F.2d 1372 (11th Cir.1982) (23 tons, 10-day voyage); *United States v. Julio-Diaz,* 678 F.2d 1031 (11th Cir.1982) (3 tons); *United States v. Freeman,* 660 F.2d 1030 (5th Cir.1981) (10-day voyage, 20 tons); *United States v. Mazyak,* 650 F.2d 788 (5th Cir.1981) (19-day voyage, 7 tons); *United States v. Alfrey,* 620 F.2d 551 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980) (9 tons, 3 crewmembers, voyage from Colombia to Florida). Here, an eight-member crew sailed some 2,000 miles aboard a cramped vessel loaded with 14 tons of marijuana, factors that strongly support an inference of knowing participation.

To be sure, in the cases cited, the boarding officers either smelled the odor of marijuana or observed the substance in places where it could easily be seen by those on board. Appellants argue that as the marijuana was out of sight in the hold, their knowing participation should not be inferred solely from the length of voyage and the necessarily close relationship of the crew.

In *United States v. Bland,* 653 F.2d 989 (5th Cir.1981), the court reversed the convictions of crewmembers aboard a tug that had towed a barge laden with 18 tons of marijuana from Florida to Louisiana. When Customs officials boarded the tug and barge, they observed no evidence of marijuana nor did they notice its smell. Marijuana was later discovered in the hold of the barge. Although it affirmed the convictions of the tug's captain and the master of a yacht that had sailed out to meet the barge, the court held that the government had failed to muster sufficient evidence that the crew of the tug and yacht had knowingly participated in the conspir-

acy. 653 F.2d at 996–97. *See also United States v. Willis,* 639 F.2d 1335 (5th Cir.1981) (affirming as to captain but reversing as to crew where government failed to adduce any evidence of knowledge aside from presence aboard the craft; 17 tons of marijuana, 3 crewmembers), *reh'g denied,* 646 F.2d 189 (5th Cir.1982).

In the instant case, however, the government produced other evidence of knowing participation. When the vessel arrived in Colombia—the leading source country of marijuana imported to the United States, according to expert testimony at trial—all eight crewmembers were aboard. The jury heard evidence that some of the bales aboard the vessel were packaged with labels bearing the name "Colombia." This together with the crew's four-day layover strongly suggests that the vessel was loaded with marijuana in Barranquilla. Both defendants took pains to establish by their testimony that they were away from the vessel for the entire layover, returning just in time to embark. The jury was free to disbelieve these self-serving accounts of the events in Barranquilla. Indeed, Lopez's testimony that he stayed with "Fernando," a long-time friend whose last name he could not recall, seems incredible. If the jury disbelieved these stories, it could conclude that the fabrications were all the more evidence of guilt. *See United States v. Smith,* 680 F.2d 255, 260 (1st Cir.1982).

This is enough, we think, to distinguish this case from *Bland,* where there was no evidence concerning the origin of the marijuana and no evidence that the crew of the tug had been associated with the barge prior to embarking from Florida. But there was additional evidence here from which to infer appellants' knowledge.[5] Re-

---

5. Appellants also rely heavily on *United States v. Mehtala,* 578 F.2d 6 (1st Cir.1978) and *United States v. Francomano,* 554 F.2d 483 (1st Cir.1977). In those cases, which arose from common facts, we overturned the convictions of five youthful passengers who were aboard a pleasure yacht when the Coast Guard discovered 50 pounds of recently discarded marijuana floating in its wake. No drugs were found

aboard. In view of the relatively small, easily concealable amount of marijuana and the fact the passengers were youthful adventure seekers whose purpose was apparently to exchange their labor for passage, we were unable to find sufficient evidence that they knowingly aided the smuggling. These cases cannot help appellants who served as professional sailors aboard a vessel crammed with marijuana.

garding Ramos, the government introduced documents taken off the vessel which listed him as a second mate and navigator. As such he handled the LORAN navigating equipment and made entries in the ship's log. These indicated that after the vessel left Barranquilla she headed in a northeasterly direction. There was evidence that a vessel following this course would avoid heavily travelled shipping lanes but would, in the process, travel a longer distance. Ramos explained that he did not choose this course but was only following a course plotted by the captain. The jury was free to disbelieve this explanation and to infer that Ramos would not have been entrusted with sensitive navigational duties without knowing the nature of the voyage. As for Lopez, the airline ticket receipts which he had saved cast serious doubt on his explanation of his spontaneous hiring on the docks of Aruba. That both Lopez and Mena preserved the receipts supports an inference that they were not randomly chosen from among the laborers on the docks as they testified. Finally, the large quantity of marijuana, the presence of so many men on board, and the obvious fact that TIGER ROSE could only be unloaded clandestinely, suggested that the crew's duties would include offloading the marijuana. A jury could believe it highly unlikely that persons expected to assist in such an activity would be kept in the dark as to the vessel's purposes.

*Affirmed.*