939 F.2d 233
 33 Fed. R. Evid. Serv. 1040
 UNITED STATES of America, Plaintiff-Appellee,
v.
Fernando Segura PRETEL, Abraham Valencia Codognotto, Orlando
Enriquez Munoz Herrera, Gregorio Jose Carrasquilla Garrido,
Arsenio Marin Pineda, Alvaro German Salgado-Caballero, and
Orlando Barrero Morales, Defendants-Appellants.
 No. 90-3610.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 6, 1991.
 
 Mark McTernan, New Orleans, La. (court-appointed), for Pretel.
 Daniel A. McGovern, IV, Federal Public Defender, New Orleans, La. (court-appointed), for Codognotto.
 Brian M. Begue, Federal Public Defender, New Orleans, La. (court-appointed), for Herrera.
 Robert P. Early, Federal Public Defender, New Orleans, La. (court-appointed), for Garrido.
 John Simmons, Jr., Federal Public Defender, Covington, La. (court-appointed), for Pineda.
 Milton Masinter, Federal Public Defender, New Orleans, La. (court-appointed), for Orlando B. Morales.
 Dwight M. Doskey, Federal Public Defender, Harvey, La. (court-appointed), for Amaya.
 John T. Mulvehill, Federal Public Defender and Robert F. Barnard, Asst. Federal Public Defender, New Orleans, La. (court-appointed), for Salgado-Caballero.
 Michael E. McMahon, Peter G. Strasser, Eileen G. Shaver, Asst. U.S. Attys., and John P. Volz, U.S. Atty., New Orleans, for U.S.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, KING, and DUHE, Circuit Judges.
 DUHE, Circuit Judge:
 
 
 1
 The appellants, all crew members of the vessel Zedom Sea, challenge their convictions for possession of cocaine with intent to distribute while on board a vessel subject to the jurisdiction of the United States. They contend that the court erred in determining jurisdiction as a matter of law, in failing to dismiss the indictment based on the government's alleged destruction of evidence, and in admitting purportedly irrelevant and prejudicial evidence. In addition to joining his coappellants in contesting the sufficiency of the evidence to support the verdict, appellant Pineda also contends the trial court issued an erroneous jury instruction. Finding no error, we affirm.
 
 Facts and District Court Proceedings
 
 2
 While on routine patrol in international waters near the Yucatan Peninsula, the Coast Guard cutter Cushing, a specially equipped armament in the War on Drugs, spotted the supply vessel Zedom Sea. Noting that the vessel flew a Panamanian flag, the Coast Guard inquired via radio as to its home port, the nature of its cargo, its last port of call, its destination, and the size of its crew. The ship's master, appellant Pineda, replied that the Zedom Sea was bound from Barranquilla, Columbia, carrying cement, gelatin, and a crew of nine to Tampico, Mexico.
 
 
 3
 Suspicious of the vessel's stop in Columbia, the Coast Guard requested, and was granted, permission to board the vessel to check its manifest. When that check revealed discrepancies between the information relayed by Pineda and that contained in the documents, the Coast Guard requested permission to search the vessel. The master consented to a generalized search but professed that he had neither the authority to authorize a search of the padlocked cargo containers nor the keys to access them. Coast Guard personnel searched all other areas of the vessel, finding neither contraband, weapons, nor keys to the padlocks. They did note, however, the peculiarity of having padlocked containers on such a vessel, as well as the presence of a white powdery substance near the doors of two of the containers.
 
 
 4
 After returning to the Cushing, the Coast Guard followed the Zedom Sea as it resumed its westward journey, its lights illuminating the cargo deck of the supply vessel. The Cushing then radioed the mainland, requesting a "statement of no objection" from the Panamanian government authorizing a full search of the cargo containers. Relying upon permission received from then-deposed Panamanian president Eric Arturo Delvalle, Coast Guard personnel re-boarded the Zedom Sea, and opened the cargo containers with bolt cutters. As the vessel's crew looked on stoically, the searchers gleefully produced six tons of cocaine from beneath the bags of cement in two of the eight cargo containers. That quantity of drugs, worth approximately 600 million dollars, represents the largest maritime drug seizure in history.
 
 
 5
 All nine crew members were indicted for possession of cocaine with intent to distribute while on board a vessel subject to the jurisdiction of the United States, a violation of 46 U.S.C.App. Sec. 1903. After the jury returned a verdict convicting all crew members, the trial court denied their motions for acquittal. However, the court reconsidered its ruling after sentencing and entered a judgment of acquittal as to the vessel's cook. The remaining convicted seamen take this appeal.[1]Jurisdiction
 
 
 6
 The appellants argue that the trial court improperly decided as a matter of law that the United States had criminal jurisdiction over the vessel rather than submitting the jurisdictional question to the jury. We find no error.
 
 
 7
 Possession of controlled substance on a vessel "subject to the jurisdiction of the United States" is proscribed by 46 U.S.C.App. Sec. 1903. For the purposes of the statute, such a vessel includes:
 
 
 8
 (C) a flag vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States....
 
 The section continues:
 
 9
 Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under subparagraph (C) ... of this paragraph may be obtained by radio, telephone, or similar oral or electronic means, and may be proved by certification of the Secretary of State or the Secretary's designee.
 
 
 10
 Pursuant to this statute, the United States asserted jurisdiction over the vessel under the authority of a statement of no objection (SNO) issued by then-deposed Panamanian president Eric Arturo Delvalle. Although Manuel Noriega had replaced Delvalle with a puppet ruler by the time of the seizure of the Zedom Sea, the American ambassador to Panama testified that the U.S. State Department had declined to diplomatically recognize the new leadership. That fact notwithstanding, the appellants contend the SNO should have been obtained from the Noriega government. Furthermore, they argue that the validity of the SNO was a factual question that should have been submitted to the jury rather than decided by the court as a matter of law.
 
 
 11
 As both parties concede, the law interpreting section 1903 and its predecessor, section 955a, is in a state of disarray. Compare United States v. Bent-Santana, 774 F.2d 1545, 1548 (11th Cir.1985) (holding that "[t]he jurisdictional reach under section 955a is strictly a question of law") with United States v. Ayarza-Garcia, 819 F.2d 1043 (11th Cir.), cert. denied, 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987) (holding that whether a vessel is subject to jurisdiction under section 955a is a question of fact).
 
 
 12
 In support of their argument, the appellants rely upon United States v. Aikins, 923 F.2d 650 (9th Cir.1990), a case decided under section 1903. Acknowledging that the fact-versus-law question "has been a matter of debate," Id. at 657, the court concluded:
 
 
 13
 [w]hen a jurisdictional fact is at issue, the court should determine the existence or not of the fact.... Where the jurisdictional fact is disputed, as it is here, the court should rule only after a full presentation of the evidence.
 
 
 14
 Id. (citations omitted).
 
 
 15
 Implicit in the court's holding is the notion that any jurisdictional fact at issue must be one within the authority of the judicial branch to resolve. Unlike other cases, in which the factual dispute was within the reach of the court's constitutional competence,[2] the fact at issue here involved whether Delvalle, the exiled Panamanian leader, had the capacity to issue a valid SNO. The Supreme Court has previously noted that "[w]hat government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government." Guaranty Trust Co. v. United States, 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938). Accordingly, because the ambassador testified that Delvalle was the leader recognized by the U.S. State Department at the time of the vessel's seizure, the trial court correctly determined the jurisdictional reach of the statute without submission of the issue to the jury.[3]
 
 Sufficiency of the Evidence
 
 16
 In reviewing a challenge to the sufficiency of the evidence, this court must determine whether "a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt." United States v. Carrasco, 830 F.2d 41, 43 (5th Cir.1987). It is not necessary that the evidence exclude every hypothesis of innocence, and "a jury is free to choose among reasonable constructions of the evidence." United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982). We view all inferences and credibility choices in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 
 
 17
 Conviction for the charged offense requires proof that the appellants knowingly possessed the drugs with the intent to distribute them. United States v. Williams-Hendricks, 805 F.2d 496, 500 (5th Cir.1986). Proof of constructive possession is sufficient; thus any showing that the appellants exercised ownership, dominion, or control over the contraband will suffice. United States v. Hernandez-Palacios, 838 F.2d 1346, 1349 (5th Cir.1988). Furthermore, we have held that distribution includes all acts in furtherance of a sale, including offloading drugs from a mother ship. United States v. Pool, 660 F.2d 547, 561 (5th Cir. Unit B 1981).
 
 
 18
 Central to the government's case was proof of its theory that the Zedom Sea was a "mother ship" that rendezvoused with one or more other vessels between the time it left Barranquilla and the time of the Coast Guard seizure. The appellants dispute that theory, arguing that there is no evidence to support the contention that Zedom Sea crew members onloaded or offloaded cocaine at any time during the voyage. After a review of the record, we find ample evidence to sustain the jury's verdict.
 
 
 19
 We begin by noting that the Zedom Sea was outfitted with a crew of nine, two more than its usual cadre, suggesting that extra hands were needed for mid-voyage offloading activities. The Cushing's captain, a Coast Guard officer who had participated in hundreds of boardings, testified that the arrangement of the cargo containers was illogical and unbalanced, suggesting that accessibility to the two cocaine-laden containers was the vessel's top priority. He and another witness testified that the lead seals, which should have remained undisturbed from the time they were placed on the cargo containers in Barranquilla, appeared rusted and re-used.
 
 
 20
 A sweep of other regions of the Zedom Sea revealed other suspicious attributes of the vessel. The Zedom Sea was equipped with a short-range ham radio frequently used by drug-running vessels, though not frequently seen on ordinary supply vessels. A government witness indicated that this type of radio is advantageous to a mother ship, since it permits the vessel to communicate with rendezvous boats with less risk that their transmissions will be intercepted by distant patrol boats. The vessel was also equipped with a very sophisticated German auto-pilot device, another common accessory on drug boats. Search crews uncovered secret compartments and an anchor chain compartment that had been increased in capacity by twenty percent to accommodate a modification in the length of the chain. Although no contraband was discovered in these areas, the vessel's designer testified that neither modification was necessary for the legitimate use of the vessel. Such modifications to a vessel have previously been considered persuasive evidence of guilty knowledge. See United States v. Passos-Paternino, 918 F.2d 979, 984-86 (1st Cir.1990).
 
 
 21
 Perhaps most telling was testimony by the Cushing's captain and boarding officer that cement dust was noted on the vessel's deck in front of the doors of the two cargo containers laden with cocaine. The government introduced persuasive evidence that tended to refute any possibility that the dust could have remained on the deck from the time of the vessel's loading in Barranquilla. A meteorologist testified that based upon satellite weather reports spanning the length of the Zedom Sea's voyage, the probability that the vessel did not encounter severe weather was "almost zero." That expert noted that wide bands of severe rain and wind storms, common during hurricane season in the tropics, undoubtedly pelted the Zedom Sea on September 26 and 27. Thereafter, the Zedom Sea enjoyed relatively calm conditions for the next few days, with rough weather returning shortly after the vessel was seized by the Coast Guard. The jury could have concluded that the Zedom Sea, its deck washed clean by the storms, had ample opportunity to rendezvous with another ship during the lull in the weather, at which time the cement dust was spilled onto the deck while the crew loaded or offloaded the cocaine from within the cement containers.
 
 
 22
 The government also introduced the testimony of the Zedom Sea's designer. He conceded that he received many complaints about the vessel's design, mostly because the small amount of freeboard, the distance between the waterline and the deck, meant that the deck was frequently awash. In fact, by the time the Zedom Sea returned to the Port of New Orleans, the cement dust noted earlier had been washed away. One of the boarding officers testified that it was improbable that the cement dust had leaked out of the containers, since their location on the open deck and the nature of the cargo they housed, both legitimate and illegitimate, required that they be tightly sealed.
 
 
 23
 The appellants argue that there was no more evidence establishing their guilt than there was with regard to defendant Calderon, the only crew member acquitted by the trial judge after the jury's verdict.[4] Without addressing the propriety of the trial court's decision to acquit Calderon, a question not before this Court, we find an insufficient evidentiary basis in the record to distinguish between the appellants and to disturb the jury's verdict.
 
 
 24
 The large quantity of drugs involved in this shipment and the probability of a mid-voyage rendezvous suggest that the Zedom Sea's illicit cargo would have to be offloaded clandestinely. The First Circuit has held that this fact should be considered in determining the guilty knowledge of an entire crew, since it is improbable that a drug smuggler would allow innocent bystanders on board. See United States v. Lopez, 709 F.2d 742, 748 (1st Cir.), cert. denied, 464 U.S. 861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983). As the Lopez court noted, "[a] jury could believe it highly unlikely that persons expected to assist in such an activity would be kept in the dark as to the vessel's purpose." Id. There is no evidence, except the self-serving testimony of the appellants, that tends to prove that any one crew member was not involved in the mid-voyage offload of the cocaine.
 
 
 25
 We are unmoved by the appellants' other arguments to the contrary as well. Although a thorough search of the vessel produced no keys to the padlocks on the containers, it is just as likely that the keys were held by the vessel or vessels that rendezvoused with the Zedom Sea. Admittedly, no defendant either had cocaine on his person or had any ownership interest in the vessel. This fact is unpersuasive, however, because constructive possession is established by proof of dominion or control, at any point, over the contraband. Hernandez-Palacios, 838 F.2d at 1349. Uncontroverted testimony regarding the cooperativeness of the appellants is similarly insufficient to alter our appraisal of the evidence.
 
 
 26
 We note that in addition to the testimony of the government's witnesses, each appellant opted to testify on his own behalf. After considering all the testimony, the jury was free to believe what it wished. We are unwilling to disturb its credibility assessments on appeal. Accordingly, we find the evidence sufficient to sustain the convictions of all the appellants.
 
 The Marcomex Evidence
 
 27
 The search of the vessel and its crewmen produced a notebook and a few pieces of paper bearing the name "Marcomex," a company known to the Drug Enforcement Agency (DEA) as a front for illicit drug smuggling. The trial court granted the appellants' in limine motion to exclude that evidence on the condition that the appellants refrain from "opening the door" and introducing it themselves. During cross-examination of a DEA expert, defense counsel, in what was possibly a slip of the tongue, asked a question about Marcomex. The district court then ruled that because the appellants had "opened the door," the government could introduce evidence regarding Marcomex's reputed drug-trafficking activities.
 
 
 28
 The appellants argue that the Marcomex evidence was irrelevant, and even if relevant, was more prejudicial than probative. We are unpersuaded.
 
 
 29
 We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. United States v. Eakes, 783 F.2d 499, 506-507 (5th Cir.), cert. denied, 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986); United States v. Acosta, 763 F.2d 671, 693 (5th Cir.), cert. denied, 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985). We give deference to a trial court's evidentiary rulings and affirm them unless they impair a substantial right of the complaining party. Fed.R.Evid. 103(a); United States v. Silva, 748 F.2d 262, 263-64 (5th Cir.1984).
 
 
 30
 As the government notes, the Marcomex evidence was relevant under Federal Rule of Evidence 401 since it had a tendency to connect some of the crew members of the vessel to a reputed drug-dealing organization. Contrary to the appellants' suggestion, the fact that Marcomex was also engaged in legitimate "front" activities makes that evidence no less probative.
 
 
 31
 Equally unavailing is the appellants' argument that the evidence, even if relevant, should have been excluded under Federal Rule of Evidence 403. We note that such an exclusion is "an extraordinary measure that should be applied sparingly." United States v. Thevis, 665 F.2d 616, 633 (5th Cir.), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Considering our rule that a defendant may not complain that he was prejudiced by evidence relating to a subject he introduced, United States v. Wilson, 439 F.2d 1081, 1082 (5th Cir.), cert. denied, 404 U.S. 836, 92 S.Ct. 122, 30 L.Ed.2d 67 (1971), we see no reason to apply that extraordinary measure here. Accordingly, we find no abuse of discretion.
 
 Destroyed Evidence
 
 32
 The Coast Guard routinely tapes all radio calls placed through its New Orleans headquarters. On the thirtieth of each month, the tapes are then "recycled" by erasing them for future use. The appellants contend that in a telephone call between a prosecutor and one of the defense attorneys, the government was informally advised of the appellants' interest in the tapes. However, contrary to established procedure between the parties, this initial request was not memorialized in a formal discovery motion.
 
 
 33
 Although numerous discovery requests were filed by the appellants before the date the tapes at issue were to be recycled, the tapes were not formally requested until October 31, when one of the defendants filed an untimely discovery request. Because the tapes had been recycled the day before, that motion and all subsequent requests involving the tapes were dismissed by the court as moot. Later, the district court denied the appellants' motion to dismiss the indictment, noting that loss of the tapes was caused by "the defendants' own procrastination." We concur in its assessment.
 
 
 34
 We distinguish cases relied upon by the appellants such as United States v. Bryant, 439 F.2d 642 (D.C.Cir.1971). In that case, the court dismissed the indictment based upon a showing that the government had received timely and sufficient notice in the form of a discovery request, yet had destroyed the requested evidence anyway. Here, the only formal request for the tapes came one day too late to preserve them and some time after the discovery deadline had expired. We note also that the content of the tapes was highly speculative, and it is doubtful that they constituted Brady material. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Accordingly, we find no error in the trial court's refusal to dismiss the indictment.
 
 The Jury Instruction
 
 35
 With regard to appellant Pineda, the captain of the Zedom Sea, the trial court instructed the jury in part:
 
 
 36
 The jury may also properly infer from the evidence that the captain, Arsenio Marin Pineda, was aware of the nature of the cargo which he had in his charge.
 
 
 37
 Relying on Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), Pineda argues that this portion of the instruction is couched in terms of a command, and thus by creating a "mandatory presumption," relieves the government of its burden of proving Pineda's actual knowledge. We disagree.
 
 
 38
 We review a jury instruction to determine whether "the charge, as a whole, is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them." United States v. Stacey, 896 F.2d 75, 77 (5th Cir.1990). "A trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented." United States v. Pool, 660 F.2d 547, 558 (5th Cir. Unit B 1981).
 
 
 39
 As the government properly argues, the language in the charge is taken verbatim from a line of Fifth Circuit decisions that address the inferences a jury may draw in a drugs-and-vessel case. See e.g., United States v. Bland, 653 F.2d 989, 995-96 (5th Cir. Unit A), cert. denied, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); United States v. Willis, 639 F.2d 1335, 1339 (5th Cir. Unit A 1981); United States v. Sanchez, 634 F.2d 938, 940-41 (5th Cir. Unit B 1981). However, because the jury instruction was not challenged on appeal in those cases, the charge at issue has never been specifically sanctioned by our Court. Accordingly, we engage in the constitutional analysis mandated in Francis, and determine whether the charge impermissibly "instructs the jury that it must infer the presumed facts if the state proves certain predicate facts." Francis, 471 U.S. at 314, 105 S.Ct. at 1971.
 
 
 40
 We find no such prohibited mandate in this charge. Instead of creating a presumption, mandatory or otherwise, the charge simply informs the jury that it may properly infer from any facts proven by the government that the captain had knowledge of the presence of the cocaine on the ship. Because this statement represents an accurate expression of the law of our Circuit and does not create the prohibited presumption, we find no reversible error.
 
 Conclusion
 
 41
 For the foregoing reasons, the judgment of the district court is
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 The appeal of convicted crewman Samuel Patino-Amaya was dismissed by this Court when he died while incarcerated in federal prison
 
 
 [2]
 See e.g., United States v. Maynard, 888 F.2d 918 (1st Cir.1989) (in which the court sought to determine whether a vessel was "stateless" within the meaning of the statute or whether it was a British vessel); United States v. Potes, 880 F.2d 1475 (1st Cir.1989) (in which the factual dispute involved whether the vessel was Honduran, Columbian, or "stateless"); Ayarza-Garcia, 819 F.2d at 1046-47 (in which the court addressed whether a vessel was sailing under more than one flag for the purpose of determining whether it was "assimilated into statelessness")
 
 
 [3]
 We note that the government complied with the requirements of Sec. 1903(c)(1) in that Delvalle's oral authorization was certified by the Secretary of State's designee. The appellants made no attempt to depose Ambassador Davis even though the government provided them with his address pursuant to an official discovery request. Accordingly, this unrebutted proof of consent was admissible under the residual hearsay exception. See United States v. Loalza-Vasquez, 735 F.2d 153, 157-58 (5th Cir.1984)
 
 
 [4]
 In entering its judgment of acquittal, the court noted that there was not "a scintilla of evidence introduced to indicate that Calderon ... [had] anything to do with the loading or unloading of the vessel."