**UNITED STATES of America, Appellee,**

v.

**Robert STEUBEN, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Guillermo CARO, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Edilberto SALAZAR, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Derrick NEIRO, a/k/a Derrick Jovan Kreyen, Defendant, Appellant.**

**Nos. 86–1542 to 86–1545.**

United States Court of Appeals, First Circuit.

Heard May 2, 1988.

Decided July 11, 1988.

Benicio Sanchez Rivera, San Juan, P.R., by Appointment of the Court, for defendant, appellant Robert Steuben.

Jose R. Aguayo, Hato Rey, P.R., by Appointment of the Court, for defendant, appellant Guillermo Caro.

Robert J. Sicilia, Santurce, P.R., by Appointment of the Court, for defendant, appellant Edilberto Salazar.

Benjamin Hiller, by Appointment of the Court, with whom Pressman, Hiller & Kruskal, Cambridge, Mass., was on brief for defendant, appellant Derrick Neiro.

Jorge E. Vega–Pancheco, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., and Luis A. Plaza, Asst. U.S. Atty., Criminal Div., San Juan, P.R., were on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

Defendants Robert Steuben, Derrick Neiro, Guillermo Caro, and Edilberto Salazar were convicted, after a jury trial, on one

count of aiding and abetting the possession of marijuana with intent to distribute, and one count of aiding and abetting the possession of marijuana with intent to import it into the United States. All defendants appeal their convictions on the ground that the government failed to present sufficient evidence for the jury to find them guilty beyond a reasonable doubt on each count. Defendants Steuben and Salazar also contend that the district court committed certain errors that deprived them of fair trials.

We find this to be a close case as to the sufficiency of the evidence. We conclude that the evidence supporting the convictions of Steuben, Neiro, and Caro is sufficient but that the evidence as to Salazar's involvement is insufficient. Since the alleged errors of the district court separately asserted by Steuben and Salazar were not preserved for our review, and the alleged errors are not "plain," see *United States v. Williams*, 809 F.2d 75, 82 (1st Cir.1986), we do not address them.

## FACTS

On October 18, 1985, at a location approximately 145 miles northwest of the Guajira Penninsula, Colombia, the United States Coast Guard Cutter *Unimak* approached the tugboat *Zeus III*, which was towing a barge with a cable about 600 to 700 feet in length. The tug and the barge were not underway. The Coast Guard made radio contact with *Zeus III* and spoke with defendant Steuben, a German national, who identified himself as the master and captain of the vessel.

Steuben, speaking English, informed the Coast Guard that *Zeus III* was registered in Panama; that the crewmen were Cuban, Colombian, Antiguan, Haitian, and West German; that their "last port of call" was Bonaire, an island off the coast of Venezuela, which they had left on October 14th; and that their "next port of call" was Aruba. Steuben told the Coast Guard that the purpose of the voyage was to deliver a dredge barge. He said that they had been "in the water" for four days due to a "hot bearing" or "oil clog."

The Coast Guard asked Steuben if he was in need of assistance, and he replied that he did not need assistance because he had on board a mechanic who could fix the engine. Steuben asked the Coast Guard if they could tell him his exact position. They replied that they could not do so on the radio. The Coast Guard requested permission to board *Zeus III* for the purpose of providing Steuben with his exact position and checking documentation. Steuben granted the Coast Guard permission to board.

Upon boarding the vessel, the Coast Guard proceeded with the document check and questioned Steuben further about the crew members, the ship's country of registration, and the nature and purpose of the voyage. Steuben repeated the same answers regarding the nationalities of the crew members, the ship's country of registration, and the purpose of the voyage. In contrast to what he had said over the radio, however, Steuben told the boarding officers that his last port of call was Cartagena, Colombia; that they had left Cartagena on October 8th; and that his next port of call was Bonaire. When questioned about the contents of the barge, Steuben replied that it was empty, and that he was simply transporting the barge from Cartagena to Bonaire. Steuben supplied the Coast Guard with documents indicating that *Zeus III* had departed Cartagena on October 8, 1985 and that the vessel was sailing under the flag of Panama. He also presented to the Coast Guard a document, issued in Cartagena, listing the names of the crew. Although the number of crew listed corresponded to the number on board *Zeus III*, three names on the list were inaccurate. Defendant Neiro was not on the crew list, nor were two co-defendants, Perez and Rodelo, who are not before us in this appeal.

Boarding officers also spoke with defendant Neiro, the only other English-speaking crew member, about the nature of the voyage. Neiro explained that they had been at sea for four days, and had been drifting for two days.

The Coast Guard then inspected the engine room of *Zeus III*. With the assistance

of defendant Neiro, who served as translator, defendant Caro, the ship's mechanic, showed the officers around the engine room. They inspected holds by unbolting access covers. Caro showed the officers the faulty engine bearing that had caused the engine trouble. The officers inspected two empty fuel oil tanks, but did not check to see how much fuel remained in the other tanks.

The boarding officers next obtained permission to board the barge. They observed that it was riding low in the water and showing no navigation lights. Upon boarding the barge, the Coast Guard officers observed that there was nothing on top of it except some boards in the middle held down by angle irons, pieces of iron bolted to the deck. They took off one of the angle irons and spread the boards out. One officer found a small piece of green leafy matter between two of the boards. Searching between the boards, the officers were able to obtain a fistful of the leafy substance. The officers conducted a field test of the substance; it tested positively for marijuana. They then informed Steuben that they had found marijuana on board the barge, and with his permission, they remained on board *Zeus III* through the evening.

That night, officers observed Steuben instructing one of the crew members, Perez, to make radio contact with a party called "Puerto Rico, Puerto Rico." Steuben spoke to Perez in "broken Spanish." Steuben told one officer that they were attempting to make contact with "their agent."

The next morning, October 19, 1985, defendant Neiro spoke to the same officer he had spoken to the day before about the nature of the voyage. He was nervous about the fact that marijuana had been found on board the barge. In contrast to his earlier statement that they had been at sea for four days, he said that they had left Cartagena, Colombia nine to ten days earlier. He also said that when they left Cartagena, there was no barge attached to the tug. He repeated his statement that they had been adrift for two days, but added

that their next port of call was Bonaire. He stated that he was hired in Cartagena as a seaman aboard *Zeus III* for $300 and that he knew navigation.

The boarding officers observed that the tug was not well-maintained. They also observed radio and radar antennas on the tug. There was a long antenna attached to a short wave radio that had been used to contact "Puerto Rico, Puerto Rico."

Two Coast Guard officers, accompanied by Steuben, boarded the barge a second time. The officers discovered four access plates under the boards that they had spread apart the previous evening. Upon removing the access covers, which were new and secured with clean, well-greased bolts, the officers discovered a cargo of marijuana stowed in the main hold of the barge. The marijuana was in bales that were well packed and protected with plastic covering. The "street value" of this marijuana was approximately $42 million.

The officers and Steuben returned to the tug with one of the bales of marijuana. Subsequently, the officers observed the crew members using a long distance radio, attempting to contact a party they referred to as "Puerto Rico, Puerto Rico." This time contact was made. Later in the afternoon of October 19, the entire crew was placed under arrest.

At trial, Coast Guard officers who had intercepted *Zeus III* testified that all crew members were present when radio contact was made with the party, "Puerto Rico, Puerto Rico." The conversations were in Spanish. According to the testimony of one officer, who spoke Spanish, Perez told the party, "We are unable to continue our voyage at this time because of Coast Guard detainment. We are being searched." When the party asked, "What is your status?" Perez replied, "We have been boarded, they are searching us, they are here with us." The party on the radio then said, "Not to worry, we will rendezvous with you later." Defendant Neiro then spoke on the radio and told the party to "tell our families not to worry, we are okay, and please do not tell them what is happening." Perez then spoke a second time, stating

"we cannot continue to talk at this time because they are here with us, they understand us." Defendant Caro then spoke briefly with the party, but there is no testimony about the substance of his conversation. Neiro spoke a second time, stating, "Do you see what you have gotten us into now, you stupid...." Defendants Salazar and Steuben were present in the pilot house of the tug with the other crew members when these conversations took place. But neither Salazar nor Steuben spoke directly with the party.

Coast Guard Quartermaster Kinney, who was trained in advanced navigation, was the "Seizing Officer" of the Coast Guard team that boarded *Zeus III*. He was present when officers asked Steuben on October 18 where he thought the tug was located on October 18. Kinney testified that Steuben pointed to a position on a chart that was laid out on the tug's chart table. According to Kinney, that point was approximately 120 miles south-southeast of the position indicated on Steuben's satellite navigation instrument (SATNAV). The boarding officers brought with them to *Zeus III*, the position indicated on their own SATNAV, which coincided with the latitude and longitude given on the same instrument aboard *Zeus III*. Kinney testified that the SATNAV position was the actual position of the vessel.

The chart found on the chart table was admitted into evidence as Exhibit 9. It is a nautical chart of the Eastern Part of the Carribean Sea showing the West Indies, from Jamaica to Trinidad, and the North Coast of South America, from the Panama Canal to Venezuela. Examining the chart in view of the jury, Kinney indicated the location of Cartagena, Colombia and the island of Bonaire, to the north and east of Cartagena, off the coast of Venezuela. Kinney marked three points on the chart showing (1) where *Zeus III* was first sighted by the Coast Guard's aircraft, (2) where the Coast Guard intercepted and boarded the tug and barge (approximately 145 miles directly northwest of the Guajira Peninsula and 20 miles due west of the position where it was first sighted) and (3) where Steuben had indicated to the boarding officers that

he thought the vessel was located (approximately 120 miles southeast of the tug's position when seized and 35 miles north of the Guarjira—closer to Aruba and Bonaire than his actual position).

The government then directed Officer Kinney's attention to a chart admitted into evidence as Exhibit 10, which the boarding Coast Guard officers found, along with sixteen other charts, "underneath the chart table and underneath the bench right next to the chart table." Exhibit 10 is a nautical chart of the North Coast of Colombia and Venezuela. It shows, in more detail than Exhibit 9, the Guajira Peninsula and the islands off the north coast of Venezuela, including Aruba and Bonaire. Puerto Rico and the other islands of the West Indies are not included on the chart. The government again asked Officer Kinney to mark, on Exhibit 10, the locations of *Zeus III* when it was sighted by the Coast Guard's aircraft and eventually seized, as well as the point where Steuben had estimated his position to be. Kinney testified that there were some "track lines" on Exhibit 10 representing the intended course of "the vessel." He testified that these lines go from Cartagena northerly in the direction of the Santa Marta Peninsula off Colombia and then in a northeasterly direction. Some of the track lines had been erased, but position marks, indicating points on the chart where a vessel had actually been, were visible. The prosecution asked Kinney, "[A]ccording to that track line to what specific part of the Caribbean, if at any, are these track lines headed?" Kinney answered, "These track lines, if you follow them all the way up ... go to the Mona Passage in the southwest corner of Puerto Rico." He also testified that according to his calculations, if one extrapolated the "track lines" towards the Mona Passage, "it" passes just about through the position where *Zeus III* would have been located when it broke down.

Kinney was then asked by the government to reexamine Exhibit 9. He testified that there were no track lines on that chart, but that there were some position marks that were visible even though they

had been erased. He further stated that some position marks were not erased. Kinney testified that the position marks "go in the same direction and show the same general movement of course" as the "track lines" in Exhibit 10. The prosecution then asked: "And if a vessel takes that direction, the direction on the maps, where, if at anyplace, would it be heading?" Kinney responded, "Sir, if it was on the other chart it would be heading to this area of Mona Passage." He further testified that the distance to Mona Passage from the place where *Zeus III* was seized was approximately 340 miles.

On cross-examination, Officer Kinney testified that there was no way of knowing who placed the "track lines" on Exhibit 10. He also testified that there were position and track marks on the other fifteen charts found aboard *Zeus III.*

Steuben was the only defendant to testify. On direct examination, Steuben explained that the tug's last port of call when it was intercepted by the Coast Guard was Cartagena, Colombia, and that he initially explained to the Coast Guard that Aruba was his next port of call because it was the best port to go to given the tug's engine trouble. On cross-examination, he stated that he could tell the difference between a full barge and an empty barge by the way they would ride in the water, and that he had watched the barge towed behind *Zeus III.* He maintained that he had thought it was an empty dredge barge. Steuben further testified that his "agent" or employer was one Walter Bowen, who lived in Miami or Tampa, Florida.

The government questioned Steuben about whether he or the members of his crew set foot on the barge at any time. He testified that while in Cartegena, the barge was tied alongside the tug and before reaching the open sea it was necessary to send two or three crewmen aboard the barge to untie lines and then quickly jump aboard the tug as the barge drifted back to be towed. Steuben testified that defendant Neiro was on top of the barge in Cartagena along with either Perez or Salazar, he was not sure which. Describing the crewmen's work in setting the barge into its towing position, Steuben testified that there were two or three persons on the barge: "That was Perez who was on the barge and it was Neiro. Then three of them were on the barge...."

Steuben testified that he spoke a few words of Spanish and that Neiro spoke some English. Since his other crew members spoke only Spanish, he communicated with them for the most part by using Neiro as a translator.

The jury was presented with a stipulation reached by defense counsel and the government stating that laboratory tests performed to determine whether tar found on the crew members' footwear was the same as that on the barge turned up negative. The parties also stipulated that there were approximately 907 bales of marijuana found on the barge towed by *Zeus III*, weighing, in aggregate, approximately 70,676 pounds.

## DISCUSSION

The defendants were convicted of aiding and abetting the knowing or intentional possession of marijuana with intent to distribute it while on board a vessel subject to the jurisdiction of the United States on the high seas. 21 U.S.C. § 955a(a), 18 U.S.C. § 2 (count I). They were also convicted of aiding and abetting the possession of marijuana with intent to import it into the United States. 21 U.S.C. § 955a(d)(1), 18 U.S.C. § 2 (count II).

The defendants argue that the government failed to prove that they had requisite knowledge or intent to commit the crimes charged. We have said in a case such as this that "[t]he government [is] required to prove that [the defendants] participated in the venture and sought by their actions to make it succeed. Mere presence at the scene or even knowledge that the crime is being committed is generally insufficient to establish aiding and abetting." *United States v. Quejada–Zurique,* 708 F.2d 857, 859 (1st Cir.1983).

The defendants mount a two-pronged attack on the sufficiency of the evidence with

regard to their requisite knowledge or intent. First, they assert that the government failed to prove that they knowingly or intentionally possessed marijuana, an element common to their convictions on both counts. *See United States v. Molinares Charris,* 822 F.2d 1213, 1218 (1st Cir.1987) (knowing or intentional possession of contraband required element of § 955a(a) offense); *United States v. Beltran,* 761 F.2d 1, 6 (1st Cir.1985) (knowing or intentional possession of contraband required element of § 955a(d)(1) offense). Second, they argue that even if the government presented sufficient evidence to convict them on count I,[1] they cannot be convicted on the importation count because the government failed to prove that they intended to import the marijuana into the United States. *See* 21 U.S.C. § 955a(d)(1) (applying to persons "intending that [controlled substance] be unlawfully imported into the United States"); *see also United States v. Marsh,* 747 F.2d 7, 12 (1st Cir.1984) (defendants' knowledge and intent is requisite element of offense of conspiracy to import controlled substance into United States).

Our standard of review is whether, viewing the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government, a reasonable jury could find beyond a reasonable doubt that the defendants were guilty of the crimes charged. *E.g., United States v. Molinares Charris,* 822 F.2d at 1218; *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1074 (1st Cir.1985).

We are content that with regard to Steuben, the captain of the vessel, and Neiro, the only crewman who could speak English with the captain and who knew navigation, there was sufficient evidence to support their convictions. For the other two defendants, it is a closer case.

*Steuben*

■ We have in the past recognized that, in cases of this sort, juries may reason that "a captain normally knows what his ship contains...." *Guerrero–Guerrero,* 776

F.2d at 1074. A jury could likewise reason that the captain of a tug towing a barge would normally know what the barge contains. *United States v. Bland,* 653 F.2d 989, 996 (5th Cir. Unit A 1981). Such an inference is well-supported in this case. There was undisputed evidence that the marijuana on board the barge weighed over 70,000 pounds and that Steuben knew the difference between the way a barge with cargo would ride in the water and the way an empty barge would ride. There was testimony from members of the Coast Guard's boarding party that the barge was clearly low in the water, indicating that it contained cargo. In addition, the jury was entitled to disbelieve Steuben's statements that he believed the barge was empty and to infer from his mistatements that he was attempting to hide from the Coast Guard the fact that he was transporting contraband. All this, taken together, supported the jury's finding that Steuben had the requisite knowledge or intent to possess the marijuana cargo.

■ With regard to the importation count, we likewise find the evidence sufficient with regard to Steuben. On the evening of October 18, after the Coast Guard had informed Steuben that they discovered the marijuana on the barge, he directed Perez to contact "Puerto Rico, Puerto Rico" on a radio equipped for long-range communications. It can be deduced from the testimony at trial that "Puerto Rico, Puerto Rico" was Steuben's agent. The jury could infer that the "agent" knew the nature of the cargo and had planned the operation. When Perez contacted that party (or agent) the following day, conversations between crew members and the agent reasonably could lead the jury to find that (1) because of its code name, the party was located in Puerto Rico and (2) the agent expected to rendez vous with the vessel in order to receive the marijuana. From this, the jury reasonably could conclude that Steuben had arranged with his agent in Puerto Rico to transport the marijuana to

---

**1.** Defendants do not contest the sufficiency of the government's proof regarding the intent to distribute under § 955a(a), conceding that the amount of marijuana involved provides the inference that it was intended for distribution.

that destination. This would support the jury's finding of an intent, on the part of Steuben, to import the marijuana to the United States.[2]

### Neiro

The evidence against Neiro also supports his convictions. The jury could infer his guilty knowledge from the following: Neiro spoke English and was in close communication with the captain. He also knew navigation, and the jury could infer that he was involved in the navigation of *Zeus III.* His close communication with the captain along with his likely role in the navigation of the vessel would support an inference that he shared Steuben's knowledge about the nature of the cargo. *See Guerrero–Guerrero,* 776 F.2d at 1077 (closeness of relationship between crew and captain is factor supporting inference of guilty knowledge); *United States v. Lopez,* 709

F.2d 742, 748 (1st Cir.1983) (navigator of voyage would reasonably know nature of voyage). In addition, Neiro was one of three defendants whose names did not appear on the official crew list. From this, the jury could reasonably infer an illicit motive on the part of Neiro because of an apparent intent to hide his identity from authorities.

■ Neiro's communication with "Puerto Rico, Puerto Rico" would also support the jury's finding that he participated in the importation scheme. The fact that he spoke directly to that party and told them to tell his and other crew members' families that they were "okay" but not what was happening, would indicate that "Puerto Rico, Puerto Rico" knew him and his family and that he was engaged in a plan with that party to transport the cargo to Puerto Rico.[3]

2. We question the probative worth of the government's evidence regarding track and position markings on two charts found aboard *Zeus III.*

While we have in the past found track markings on nautical charts probative of defendants' intentions to import controlled substances, *United States v. Beltran,* 761 F.2d at 7; *United States v. Marsh,* 747 F.2d at 12, in those cases, the significance of the charts found and the track markings on them was far more apparent. In *Beltran* the Coast Guard seized a marijuana-laden vessel north of Bermuda that was heading in the direction of the Gulf of Maine. At the top of a number of charts found was a chart with an erased track line leading to an area of the Gulf of Maine, "an area used as a popular offload site for drugs to be smuggled into the United States." *Beltran,* 761 F.2d at 7. Other charts on board were of the east coast of the United States. In *Marsh,* where a marijuana-laden vessel was seized some 270 miles off the northeast coast of the United States, we found probative of the defendants' intent to import the fact that "the most accessible chart indicated a United States destination while no charts covered ports of call in other countries." *Marsh,* 747 F.2d at 12. We nevertheless said that it was a "close question" whether this and other circumstantial evidence could support a finding that the defendants knew the cargo's destination. *Id.*

The relationship between the track markings on the charts found aboard *Zeus III* and an inference that the defendants' intended to import the marijuana is even more tenuous in this case. As the defendants point out, unlike *Marsh* and *Beltran,* there were myriad possible destinations for the *Zeus III* other than the United

States, given its location when seized, some 340 miles southwest of Puerto Rico. More importantly, however, the chart that contained the "track marks"—the marks themselves, having been erased, being, in our view, unhelpful—was found among 15 others that also had track and position marks on them, and there was no evidence that would support an inference that Steuben or any other crew member placed the track marks leading "in the direction of Mona Passage" on Exhibit 10. In short, this evidence is, at best, only weakly corroborative of other evidence indicating a Puerto Rico destination.

3. In its brief, the government makes much of the fact that both Steuben and Neiro apparently made contradictory statements about the vessel's itinerary. While that evidence might have been used by the jury to infer that the defendants were attempting to mislead the Coast Guard, it is not, as the government suggests, the type of "special" evidence that would support a finding of guilty knowledge on the part of defendants. *Cf. Guerrero–Guerrero,* 776 F.2d at 1074 (fact that chief mechanic, who had every reason to know what was in a room with bow thruster machiner, stated that the room contained nothing when in fact in contained 22,000 pounds of marijuana was "special" evidence of mechanic's guilt). Nor is the evidence that Steuben miscalculated his position particularly "special." In fact, our review of the charts indicates that had Steuben been where he pointed on the chart, it would have placed him closer to a course in the direction of Puerto Rico. In short, we question the probative worth of this so-called "special" evidence. In any event, as is clear from the discussion in the text, we have

*Caro and Salazar*

■ The government's case against the remaining two defendants, Caro, the mechanic, and Salazar, a regular seaman, was not as strong, and we find little authority in the prior precedent of this circuit that would control their situations. The government points to a line of authority where—upon viewing such factors as "the length of the voyage, the amount of marijuana on board, the perceptibility of the marijuana, and the closeness of the relationship" between crew members with "special reason to know" and others on board, *United States v. Guerrero-Guerrero,* 776 F.2d at 1077—we have concluded that "[a] jury is entitled to conclude that those aboard a vessel engaged in *obvious* illegal activity are not innocent bystanders." *United States v. Molinares Charris,* 822 F.2d at 1218 (emphasis added); *Guerrero-Guerrero,* 776 F.2d at 1077; *Beltran,* 761 F.2d at 6; *United States v. Lopez,* 709 F.2d at 746; *United States v. Quejada-Zurique,* 708 F.2d at 860. We find these cases distinguishable.

We cannot so easily conclude that the jury could readily find that, from the perspective of Caro or Salazar, *Zeus III* was engaged in obvious illegal activity. First, unlike that line of cases, the marijuana was not stowed aboard the vessel where the crew lived in close quarters for an extended period of time or in an area where the crew apparently had been or to which they had direct access; it was concealed in the hold of a barge towed some 600–700 feet behind them. Second, there is no evidence, as there was in those cases, that the marijuana cargo could have been perceived by the crew. Nor is there evidence that the size of the crew was abnormally large given the alleged purpose of the voyage, which might have supported an inference that the crew would be used to provide the labor for unloading the marijuana. *Cf. Molinares Charris,* 822 F.2d at 1219; *Guerre-*

ro-*Guerrero,* 776 F.2d at 1075; *Lopez,* 709 F.2d at 748. And we do not have a case where the crew was hostile to the Coast Guard's communication attempts or where the defendants in question previously had been convicted for the importation of contraband, factors that might reasonably support an inference of criminal knowledge or intent on the part of the defendants. *Cf. Molinares Charris,* 822 F.2d at 1219 (three defendants with prior convictions); *Guerrero-Guerrero,* 776 F.2d at 1074 (captain abruptly told Coast Guard to leave as soon as Coast Guard discovered marijuana); *Quejada-Zurique,* 708 F.2d at 858 ("standoff" between vessel and Coast Guard). Finally, unlike Neiro's situation, both Caro and Salazar, who spoke only Spanish, cannot be said to have been in close communication with the captain, the only individual who would have had a "special reason to know" about the nature of the voyage. *Cf. Guerrero-Guerrero* at 1077.

In sum, unlike the line of authority cited by the government, we are not faced with the type of evidence that would reasonably support the two step inference that (1) the vessel was obviously engaged in illegal activity and (2) given that situation, that "[a] jury could believe it highly unlikely that persons expected to assist in such an activity would be kept in the dark as to the vessel's purposes." *E.g., United States v. Lopez,* 709 F.2d at 748; *Guerrero-Guerrero,* 776 F.2d at 1077; *Beltran,* 761 F.2d at 6.

The case most closely on point is *United States v. Bland,* 653 F.2d 989 (5th Cir. Unit A 1981). Like the instant case, *Bland* involved defendants who were on board a tugboat towing a barge that contained many tons of marijuana.[4] The marijuana was sealed in the hold of the barge, there was no evidence that the marijuana could be detected by the crew by sight or smell, and there was no evidence that the hatches into the barge's hold had been removed or

pinpointed other facts that we find probative of these defendants' criminal knowledge and intent, sufficient to support the guilty verdicts.

**4.** Although the defendants in *Bland* were convicted for a conspiracy to possess with the in-

tent to distribute, that is not a material distinction for the purposes of our analysis; as in the case at bar in *Bland* the government was required to prove "that degree of criminal intent necessary for the substantive offense itself." 653 F.2d at 996.

opened during the voyage. *See id.* at 992–94. While upholding the conviction of the captain of the vessel, *id.* at 996, the court reversed the convictions of the crew members because "the government failed to introduce any evidence that the crew members knew that the barge being towed ... was carrying marijuana." *Id.* at 997. *See also United States v. Vidal–Hungria,* 794 F.2d 1503, 1513–16 (11th Cir.1986); *United States v. Willis,* 639 F.2d 1335, 1337–39 (5th Cir.1981).

In the cases of Caro and Salazar, the government failed to present any direct evidence that they knew about the nature of the cargo. Although Steuben testified that he thought Salazar may have jumped onto the barge for an instant to untie it from the tug so that it would drift behind to a towing position, there was no evidence that even if Salazar had been on the barge, he would have known that it contained marijuana. The leafy substance found by the Coast Guard boarding crew on the night of October 18 was discovered only after angle irons were unbolted and boards covering the access hatches separated. There was no evidence that the marijuana was detectable by sight or smell simply by standing on top of the barge.[5]

The government argues that there was "special evidence" of Caro's guilty knowledge because he attempted to mislead Coast Guard officials about the nature of the engine trouble. It contends that he explained the engine trouble as a "hot bearing," when, in fact, the engine trouble was dirty fuel and clogged oil filters. We find nothing in the record, however, that supports this reasoning. Caro attempted to explain the engine trouble to the Coast Guard with the help of Neiro as translator. He pointed out the "hot bearing" to the Coast Guard engineer. The engineer, who testified at trial, stated that he concluded

that the engine trouble was caused by dirty fuel. He never stated that dirty fuel could not also cause a "hot bearing," that the "hot bearing" diagnosis was unreasonable, or that Caro's explanation of the engine trouble was implicitly or explicitly contradictory.[6]

The only evidence that might support the convictions of Caro and Salazar is their involvement in the radio communications with "Puerto Rico, Puerto Rico." There was testimony that both defendants were present during that radio communication. Only Caro spoke with the party, however, and there is no evidence about the substance of his conversation. As we pointed out, the jury was entitled to find that "Puerto Rico, Puerto Rico" was the agent overseeing the scheme to transport this marijuana. Given the content of the conversations between the other crew members and that party, the jury could infer that the party and at least those conversing crew members knew one another and participated together in the illegal operation. Guilty knowledge or intent on both the possession and importation elements of the offenses charged could then reasonably be inferred.

Although the government's case against Caro is far weaker than its case against Neiro, since we do not know the substance of Caro's conversation with "Puerto Rico, Puerto Rico" and there is nothing in the record to otherwise indicate guilty knowledge on his part, we think that his role as the tug's engineer along with the fact that he spoke to "Puerto Rico, Puerto Rico" would be sufficient for the jury to find him guilty beyond reasonable doubt on the two counts. The jury could infer from the fact that he was the ship's engineer that he would know the nature of the strain placed on the ship's engine and therefore the size

---

**5.** The government's assertion, at page 36 of its brief, that the "brand new" access plates with well-greased bolts leading to the hold where the marijuana was stowed could be seen while standing on top of the barge, is disingenuous. The transcript citations offered by the government in support of this contention in fact, support the opposite conclusion: that the access plates could not be seen until angle irons were

unbolted and large boards separated. We are both surprised and disappointed that the government would make such a specious argument.

**6.** We are again troubled by the government's attempt to construe the evidence in a manner that the record does not support.

of the cargo in the barge. From the fact that he spoke with "Puerto Rico, Puerto Rico," the jury could infer that he was acquainted with that party and shared in the knowledge and intent of the criminal scheme. It is a slim case, but we think that it is not so weak that we should override the jury's determination.

Salazar's conviction, on the other hand, must be reversed. The fact that he was present during others' conversations with "Puerto Rico, Puerto Rico" simply does not suffice to prove that he participated in scheme to possess and import marijuana. There is no other evidence in the record that would show other than that he was an innocent hired hand aboard the tug with no knowledge of the illegal operation at hand. *See United States v. Bland*, 653 F.2d at 996–97; *see also United States v. Vidal–Hungria*, 794 F.2d at 1516; *United States v. Willis*, 639 F.2d at 1338–39; *United States v. Mehtala*, 578 F.2d 6, 9–10 (1st Cir.1978); *United States v. Francomano*, 554 F.2d 483 (1st Cir.1977).

*The judgments with regard to defendants Steuben, Neiro and Caro are affirmed. The judgment of conviction against defendant Salazar is reversed.*