TORRUELLA, Circuit Judge
(concurring in part and dissenting in part).
I dissent from the majority’s conclusion that the evidence was sufficient as to crew-members José Luis Casiano-Jiménez and Gustavo Rafael Brito-Fernández. I also write separately to state my conclusion that the statement “they just knew they had been caught” is inadmissible, and to note my view of the jurisdictional issue. I join the majority in affirming the conviction and sentence of engineer Alberto Angulo-Hernández and captain Eusebio Estupinan-Estupinan.
I. Sufficiency
Although there is no doubt that circumstantial evidence can be enough to support *14 a conviction, the circumstantial evidence in this case is not sufficient to sustain the charges against Casiano-Jiménez and Brito-Fernández. -Notwithstanding that the majority recognizes that mere presence at a location where contraband is discovered is insufficient proof of participation, it proceeds to effectively circumvent this rule by finding the evidence presented by the government here sufficient to convict crew-members Casiano-Jiménez and Brito-Fernández.
As to these defendants, the majority posits that four facts establish that the evidence was sufficient to convict them by proof beyond a reasonable doubt. Specifically, the majority reasons that (1) the ship was traveling from Colombia, a “primary source of drugs,” (2) the large quantity of drugs seized shows that the crew-members knew about the presence of the contraband, since drug traffickers would not' entrust such a large shipment to those whom they did not trust, (3) the screws on the hatch leading to the compartment were not tarnished, thus showing that they were placed recently, and (4) the jury could conclude that the crew-members would know that the legitimate purpose of the voyage was a ruse since the cargo was low in value and stored haphazardly. Even considering these points, I conclude that the circumstantial evidence was insufficient as to the crew-members Casiano-Jiménez and Brito-Fernández.[4]
First, it is not proper to use the fact that the defendants and the vessel originated in Colombia in a sufficiency analysis. The nation of Colombia engages in significant legitimate trade.[5] The majority’s rule sweeps too broadly in that it allows a jury to use the vessel’s Colombian point of origin as evidence that a crew-member must have known the vessel was involved in a drug transaction. Such an inference is based more on speculation than on a fact established in this case because such an inference is not adequately supported in the record. Further, such án inference cuts against the ideals of fairness and due process underpinning our system of justice. It stands on the same footing as saying that because defendants are Colombian they are more likely to be drug smugglers.
Second, I take issue with the majority’s rule that a large quantity of hidden drugs is enough under all circumstances to permit an inference that crew-members are aware of the drugs. When taken to the degree employed by the majority this rule effectively undoes our rule that mere presence is insufficient to prove knowledge. Our cases have acknowledged that entrustment with a large quantity of drugs shows the requisite knowledge. E.g., United States v. Rodríguez-Durán, 507 F.3d 749, 760 (1st Cir.2007) (pointing to expert evidence presented in that case to the effect that traffickers' “would not entrust a multimillion-dollar shipment to anyone in whom *15 they did not have confidence” (emphasis added)). Here, however, there is no evidence establishing that the crew was entrusted with any responsibility regarding the contraband. Rather, the evidence is consistent with the inference that the traffickers entrusted the drugs to the captain, and by allowable inference also the engineer. The facts of this case are distinguished from Rodríguez-Duran, where other factors indicated that the crew knew about the endeavor. In fact, in that case, the captain testified that he told the crew about the drug shipment after the voyage was underway, and the crew then became involved in loading the 1854 kg of cocaine off a boat that met the defendants’ ship on the high seas. Id. at 757. Thus, in Rodriguez-Durán, there was evidence showing that the crew was entrusted with responsibilities regarding the drugs. None is present here.
Moreover, the other cases relied upon by the majority are equally inapposite. In United States v. Guerrero, we stated that “unwitting bystanders would not have been hired to participate in the [boat’s] obvious illegal transport of millions of dollars’ worth of contraband.” 114 F.3d 332, 344 (1st Cir.1997) (emphasis added). In that case, 100 plastic-wrapped bales (later discovered to contain 5,596 pounds of marijuana) were found on board a forty-foot recreational vessel, which was equipped with sophisticated radar equipment. Id. at 335, 337. Thus, it would have been obvious to the crew that the mission was to carry suspect cargo, which was out in the open, and thus it was fair to conclude that innocent bystanders were not involved.
Similarly, in United States v. Cuevas-Esquivel, the Coast Guard recovered 2,795 pounds of marijuana that had been thrown overboard from a thirty to forty foot vessel by the crew before the Coast Guard boarded the vessel. 905 F.2d 510, 512, 515 (1st Cir.1990). We summed up the evidence by noting that the jury could “without undue strain conclude that it was simply incredible that with only four persons on board a relatively small vessel, on its way to ‘nowhere,’ with an open cargo hold, surrounded by a sea of floating marihuana bales which some of the crew had been seen dumping, that all four were not participants in this criminal venture.” Id. at 515. It was only in this context, that the court stated, “[i]t is entirely reasonable for the jury to conclude that conspirators, engaged in conduct which by its nature is kept secret from outsiders, would not allow the presence of innocent bystanders.” Id. This statement must be read in context as meaning that in that case, where the volume of obvious marijuana was overwhelming, the defendants’ claims to be an innocent bystander are unavailing. Cuevas-Esquivel does not support a rule that presence on a boat carrying a large shipment of drugs is always enough to rule one out as an innocent bystander. United States v. Piedrahita-Santiago similarly fits this pattern. 931 F.2d 127, 131 (1st Cir.1991) (involving a small, overmanned vessel, containing 9,984 pounds of marijuana which was “not disguised or inaccessible” and concluding “[t]his court has held that a relatively small vessel carrying a large quantity of drugs is indicative of knowledge and involvement on the part of the crew”). By contrast, in this case, the contraband was so well hidden on the 120-foot vessel that it took experienced Coast Guard agents days of searching to discover it.
Thus, in this case, there is no basis for drawing a comparable inference that no innocent crew-member could be aboard. The majority disagrees and reasons, by reference to United States v. Carrasco, 540 F.3d 43 (1st Cir.2008), that the “practical difficulties” involved in concealing “such a quantity of drugs” makes it unlikely that *16 the crew-members were unaware. But in Carrasco we found sufficient evidence as to two defendants where three men were found with 47 kilograms of cocaine and 170 kilograms of heroin on a twenty-one foot boat. Id. at 45, 49-51. One defendant, Mala, was the captain. Id. at 50 (“ ‘[juries may reason that a captain normally knows what his ship contains.’” (quoting United States v. Steuben, 850 F.2d 859, 865 (1st Cir.1988))). The other defendant, Carrasco, testified that he had loaded the containers (that ultimately were found to contain drugs) on the boat. Id. None of the containers were locked or secured, but were readily accessible. Id. Thus, the analogy to the present case is not sound. To be sure, the 425 kilograms of cocaine and heroin found on the Osiris II is a high-value shipment. But, it is not so much actual weight as to presume that all eight crew-members would be needed to complete the task of loading and unloading the cargo. Further, the evidence suggested that the secret hold was in place for some time and already well concealed on the 120-foot Osiris II. Compare id. at 50-51 (repeatedly noting the large quantity of drags on the small boat was an important factor). Thus, I do not understand why the “practical difficulties” involved in “concealing” the drugs shows involvement by the whole crew. Considering the numbers involved here, it would be quite practical for a small subgroup of the crew (or for that matter, non-crew) to load the drugs into the secret compartment before the crew reported for duty.
In sum, the high value of the drugs, stashed away in a small secret compartment so difficult to detect that it took the Coast Guard several days to find it, should not be enough to infer entrustment and knowledge to the crew-members of a relatively large freighter. Cf. Steuben, 850 F.2d at 867 (finding, as to two defendants, insufficient evidence that marijuana being carried in towed vessel was obvious, insufficient evidence that those defendants were willing to help evade capture, and insufficient evidence that the two defendants communicated with the captain, “the only individual who would have had a special reason to know about the nature of the voyage” (internal quotation marks omitted)). Applying the rule that large volume implies knowledge without requiring evidence of entrustment effectively means that mere presence near a large volume will be enough to support a conviction. This is not, and should not be, our rule. Thus, in my view, the majority’s attempt to portray this case as just another drug boat case mischaracterizes the evidence, finds sufficient evidence using less evidence than our previous cases, and has the effect of undermining our rule that “mere presence” is not enough to support a conviction. This outcome is a violation of the constitutional requirement of establishing guilt beyond a reasonable doubt.
Third, the evidence regarding the screws simply has no probative weight pertinent to establishing knowledge by the crew that a secret compartment existed or contained illegal drugs. The majority essentially reasons that from the shiny appearance of the screws, a jury could infer that the screws were new; from the fact that the screws were new, a jury could then infer that the drugs were placed recently; and from the fact that the drugs were placed recently, the jury could infer that all crew-members were aware of the drugs. This is at least one, and perhaps two, inferences too many, with the final inferential leap being particularly weak. There is no evidence, or even commonsense reason, that all crew-members would know about the drugs even if the drugs were loaded just before departure. Just as the evidence is entirely consistent with the inference that the captain hired an *17 unaware crew, so is the evidence equally consistent with the inference that those shiny screws were put in place without the knowledge of Brito-Fernández or Casiano-Jiménez. Furthermore, it makes no logical sense to conclude that the presence of “shiny screws” establishes, even by inference, the presence of illegal contraband. It establishes nothing.
Lastly, as to the question of the legitimacy of the voyage, the majority again relies too heavily on speculation. The evidence in the record is to the effect that the value of the cargo was approximately $25,000. I fail to see how this fact should be enough to establish that the crew-members must have known that the voyage was not for a legitimate commercial purpose. Further, the ship was headed for the Dominican Republic. It is certainly not beyond the realm of reasonable possibility that it would have picked up more valuable cargo at its destination. The government presented no evidence to foreclose this possibility.
Similarly, the majority points out the allegedly inadequate bookkeeping of the captain. But, while it may be amusing that the captain’s log was kept in a children’s notebook, I fail to see how this fact establishes that the voyage was illegitimate. Such a log may be consistent with how records are kept by captains of “tramp” steamers in the Caribbean. The record certainly does not establish otherwise. Furthermore, the record establishes that the Osiris II’s bills of lading, cargo manifests, and crew lists were properly prepared. While a jury and a court reviewing sufficiency of the evidence should not abandon common sense, neither should they rely on their common sense to speculate about what would be the normal practices for those in entirely foreign situations. In fact, such understanding, outside the ken of an ordinary jury, is something that should normally be proven by expert testimony. In this case, the record does not establish that the state of the Osiris II would be unusual or patently illegitimate to a typical Colombian seaman who plies his trade on “tramp” freighter runs in the Caribbean.[6] Speculation as to what life is like for such individuals should not replace the government’s evidentiary burden.
So, a review of the majority’s four points shows that all involve overly speculative inferential leaps. From the fact that Colombia is a known source of drugs, the majority speculates that Brito-Fernádez and Casiano-Jiménez must have known they were on a drug-running mission. From the high value of the contraband, the majority speculates that every member of the crew must be aware of the well-hidden drugs. From the shiny screws, the majority infers they were placed recently and then speculates that every member of the crew must be complicit. And from the nature of the legitimate cargo aboard, the majority speculates that the journey would be obviously illegitimate to an average seaman and imputes knowledge of the drugs to all crew-members. With due respect, I believe the majority opinion draws unfair inferences from speculation, rather than evidence. Cf. United States v. Valerio, 48 F.3d 58, 64 (1st Cir.1995) (vacating certain convictions for lack of evidence defendant *18 knew about the drugs, and stating, “we are loath to stack inference upon inference in order to uphold the jury’s verdict”).
Nonetheless, I agree with the majority that the evidence as to captain Estupinan-Estupinan is strong, especially considering the map in his quarters indicating where the drugs were hidden. The evidence as to the engineer Angulo-Hernández is closer, but barely sufficient. First, unlike the other crew-members, the evidence showed that Angulo-Hernández had made a previous voyage on the vessel. Second the jury could reasonably expect that he, as an engineer, would have a better understanding of the spaces on his boat. This is particularly true in this case where there was evidence that the placement of the secret compartment likely negatively affected the vessel’s maneuverability. Thus, while any reasonable jury should be left with reasonable doubt as to whether other crew-members simply signed on to work on a vessel that also carried a secret cargo of drugs, there is no such doubt as to the captain and engineer.
II. Lay Opinion
Finding any error to be harmless, the majority does not decide whether Coast Guard petty officer Andrus could permissibly give lay opinion testimony to the effect that, once detained, the crew’s “mood changed drastically,” the crew “seemed dejected,” and “they just knew they were caught.” Though I agree that admission of the evidence was harmless as to Angulo-Hernández and Estupinan-Estupinan, I write separately to state my view that the admission of the last statement was error.
Andrus’s statement that defendants “knew they were caught” was not rationally based on the perception of the witness, as is required by Fed.R.Evid. 701. Unlike Andrus’s previous statements, this piece of testimony said much more than that the defendants appeared dejected. The phrase clearly carries the meaning that the reason the defendants were dejected was because they knew about the existence of the hidden drugs and now knew that the Coast Guard had found the drugs. Thus, this statement confers Andrus’s lay opinion that the defendants had a guilty state of mind — in effect had consciousness of guilt. In other words, Andrus was permitted to testify that the reason the defendants were dejected was because they knew they were guilty, rather than for some other reason (such as that they were being arrested by armed agents of a foreign government).
Andrus is entitled to his own speculation about the defendants’ mental state, but such speculation should not rise to the level of admissible evidence under Rule 701. This is so because there was no foundation showing that Andrus was qualified to give his lay opinion on defendants’ mental state — as opposed to simply their outward behavior. Thus, Andrus’s perception could not rationally support such testimony. See United States v. Kaplan 490 F.3d 110, 118-19 (2d Cir.2007). Kaplan explains that the purpose of allowing lay witness opinion testimony is to allow a witness “to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts” by “testifying] in language with which [the witness] [is] comfortable.” Id. at 118 (internal quotation marks omitted). Thus, describing a defendant’s appearance as “dejected” fits comfortably within the purpose of Rule 701. But, stating an opinion as to what someone else knows is not so clear-cut. see id. at 119. Specifically,
lay opinion testimony regarding a defendant’s knowledge will, in most cases, only satisfy the rationally-based require *19 ment if the witness has personal knowledge of one or more objective factual bases from which it is possible to infer with some confidence that a person knows a given fact ... including] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were.
Id. (internal quotation marks omitted) (modifications in original). Here, Andrus had only his observations of the defendants over several days. There is nothing in the record showing that Andrus was in any position to gain insight into the defendants’ mental state. Thus, such testimony was not rationally related to Andrus’s perception, and so, should be inadmissible.
Though I conclude the error was harmless as to the captain and engineer,[7] I write separately on this issue because I think that lay opinion testimony like this, which carries such obvious implications about another’s mental state, should receive more scrutiny regarding the witness’s basis for making the statement. Thus, I differ with the majority in that I would find admission of this statement to be error and hold that district courts should consider the witnesses’s ability to perceive a defendant’s mental state before allowing lay opinion testimony as to knowledge.
III. Jurisdiction
I agree with the majority that our case-law forecloses the argument that we should require a nexus with the United States — beyond the fact of Bolivia’s eon-sent-to establish jurisdiction under the MDLEA. See United States v. Bravo, 489 F.3d 1, 7 (1st Cir.2007). Nonetheless, I write separately to note my increasing hesitation with this approach, as demonstrated by the facts of this case. Here, armed agents of the United States government seized the Osiris II and its crews for days while they literally poured over every inch of the vessel. At the time the Coast Guard encountered the vessel, the Osiris II was a Bolivian vessel on the high seas on its way from Colombia to the Dominican Republic. Other than being on a suspect vessel list, it gave no appearance of being involved in illegal activity. Aside from the principles of international law implicated, I have increasing sympathy for the view that due process requires some nexus with the United States before our government can be permitted to board such a vessel and arrest foreign citizens on the high seas for alleged violations of U.S. laws. See United States v. Zakharov, 468 F.3d 1171, 1177-78 (9th Cir.2006) (“Due process requires a district court to find sufficient nexus even when the flag nation has consented to the application of United States law.”). One could argue that any such nexus requirement is automatically satisfied by the inherent threat posed by drug trafficking on the high seas. See United States v. Martínez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir.1993) (concluding that not all statutes criminalizing conduct on the high seas are justified, but upholding the MDLEA on the theory that because drug trafficking is universally condemned, it is not “fundamentally unfair” for Congress to punish traffickers). But, I *20 think that, from the perspective of the foreign individual on the boat, some greater indication of that individual’s involvement with the United States should be required before the heavy power of United States law enforcement can be brought to bear against such an individual. The United States cannot be the world’s policeman.[8] If we continue to extend the natural borders of our national jurisdiction, we can expect others to do the same against us.[9]
IV. Conclusion
I would reverse the convictions of crew-members Casiano-Jiménez and Brito-Fernández for insufficient evidence. I would affirm the sentences and convictions of engineer Angulo-Hernández and captain Estupinan-Estupinan because the evidence against them was sufficient to support their convictions, because the evidentiary error was harmless, because our jurisdictional law is clear that no nexus with the United States is required under the MDLEA, and, as to the other issues, for the reasons articulated by the majority. I, thus, respectfully dissent as to Casiano-Jiménez and Brito-Fernández and concur as to Angulo-Hernández and Estupinan-Estupinan.

. The majority states that the evidence "strongly indicates” that the convicted defendants knew of the presence of drugs. But, of course, each of these facts also equally applies to the acquitted defendants. Yet, the majority also states that it sees no inconsistency in the jury’s verdict. While I agree that inconsistency in a verdict is no basis for overturning a sufficiently supported conviction, I think the majority should be consistent in its appraisal of the evidence and the verdict.

. At a minimum, Colombia is the world's second largest exporter of coffee. International Trade Centre, International Trade Statistics by Product Group and Country, Exports 2001-2005, http://www.intracen.org/tradstat/sitc3-3 d/ep071 .htm. It is also the fourth largest trading partner of the United States in Latin America. United States Trade Representative, Colombia FTA Facts (October 2008), http:// www.ustr.gov/assets/Trade_Agreements/ Bilateral/Colombia_FTA/asset_upload_file 901_13713.pdf.

. Petty Officer Andrus did testify that he found the cargo of the Osiris II suspicious, but he did not testify as an expert on the matter, did not explain normal shipping practices for such freighters, and did not rule out the possibility that the freighter might normally perform part of a run while empty.
Further, contrary to the majority's characterization, he eventually conceded that the manner in which the Osiris II’s actual cargo was shipped did not pose a risk to the navigation of the vessel.

. The majority concludes its harmless error analysis by adding that "the weight of the evidence against the convicted defendants” also shows that any error was harmless. For the reasons stated supra Section I, I do not concur that weight of the evidence was so strong as to bolster the conclusion that the error harmless. To the contrary, had the district court not explained Andrus’s statement, the evidence would have been highly prejudicial as the jury might have seen it as the only direct evidence of knowledge as to the crew-members.

. See also Eugene Kontorovich, The “Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U.L.Rev. 149 (2009) (arguing that the original understanding of the constitutional provision giving Congress the power to define and punish crimes on the high seas was to limit Congress's power to punish offenses committed outside U.S. territory to those offenses similar to piracy in terms of universal condemnation).

. See, e.g., Julian Borger and Dale Fuchs, Spanish judge to hear torture case against six Bush officials, The Observer, March 29, 2009, available online at http://www.guardian.co.uk/ world/2009/mar/29/guantanamo-bay-tortureinquiry.